**Lillian B. WATERS et al.,
Appellants,**

v.

**Peter G. PETERSON et al.
No. 72–1320.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 29, 1973.

Decided Oct. 12, 1973.

Rodney F. Page, Washington, D. C., with whom David J. Berman, Washington, D. C., was on the brief, for appellants.

John J. Mulrooney, Asst. U. S. Atty. with whom Harold H. Titus, Jr., U. S.

Atty., John A. Terry and J. Michael McGarry III, Asst. U. S. Attys., were on the brief, for appellee.

Before FAHY, Senior Circuit Judge, and LEVENTHAL and ROBB, Circuit Judges.

LEVENTHAL, Circuit Judge:

This appeal from the denial by the district court, Waters v. Stans, 341 F. Supp. 441 (D.D.C.1972), of a prayer for declaratory and injunctive relief, claims that First and Fifth Amendment rights were violated by a five day suspension of appellants by the Bureau of the Census for violation of a regulation prohibiting "conduct which violates common decency, or morality or use of improper or obscene language."[1]

Appellants, Lillian B. Waters and Joseph R. Cooper, Jr., were leaders of a "Task Force" organized by certain black employees at the Bureau of the Census in Suitland, Maryland, to protest alleged racial discrimination in hiring and promotion practices at the Bureau. A main focus of the protest activity was the public cafeteria utilized by many Bureau employees in the basement of Federal Building #3, in a complex of federal buildings in Suitland. On several occasions, members of the "Task Force", including appellants, protested during lunch-time hours, either at the back of the cafeteria near the primary entrance, or by parading through the main aisles and cross aisles, holding signs lettered with slogans. One of these read "Pigs Off Census." These protests continued for several months, and during this time, prior to July 16, 1971, no Bureau official ever advised or warned any member of the Task Force against this cafeteria activity, or sought any reprisal.

On July 16, 1971, between 12:30 and 1:00 p. m., approximately six employees,

---

1. This is the language of item 17 of the Table of Offenses and Penalties set forth in Appendix A, Department of Commerce Administrative Order 202–751, "Employee Grievances." (J.A. at 63). The Table sets forth, under Penalties: First offense, written reprimand to removal. Second offense, 30 days suspension to removal. Third offense, removal. Appendix A states that "When disciplinary action becomes necessary, consideration should be given to this table as a general guide."

including appellants, were holding signs near the entrance to the cafeteria. Among the reasons for the picketing was the alleged discriminatory discharge of Mrs. Denise Gray, attributed by the demonstrators to the actions of two white female supervisors in the Bureau, Mrs. Stockwell and Mrs. Gans.

While the peaceful picketing was in progress, these two supervisors entered the cafeteria, bought their lunches and sat down at a table. Some time later, appellants walked down the main aisle to that table, and stood in close physical proximity to the two supervisors.[2] They then held aloft a large sign (two feet by four feet) which read "PIGS OFF CENSUS." The sign was seen by a large number of the patrons of the cafeteria, and caused a stir. After five minutes, the supervisors stopped eating their lunch and left the cafeteria, visibly upset.

On July 26, 1971, appellants were informed by letter of their proposed suspension[3] for a period of five working days for "misconduct which violates common decency in employee relations." After preliminary proceedings in the Bureau, appellants were notified of their suspension. Their action, filed October 1, 1971, in the District Court sought a declaratory judgment and injunctive relief. Judge Gesell issued a temporary restraining order, directing that a hearing be held to review the administrative action taken. An appeals examiner was designated by the Bureau. He conducted a hearing on October 19, and on November 11 rendered his decision supporting the decision to suspend. On cross motions for summary judgment, the District Court, by memorandum and order of February 17, 1972, dismissed appellants' complaint. The Bureau agreed to stay the suspensions pending the appeal.

## I. CLAIM THAT ACTIVITY IS PROTECTED BY THE FIRST AMENDMENT

Appellants first claim that their activity was protected speech under the First Amendment. For purposes of analysis, Street v. New York, 394 U.S. 576, 89 S. Ct. 1354, 22 L.Ed.2d 572 (1969), we separate out two features of the activity involved: one, their use of the epithet "Pigs Off Census," and the other, the appellants' conduct, their standing close to the supervisors at the table during their demonstration.

### A. The Words

Judge Gesell found that "what occurred in this instance was a pointed verbal assault on fellow employees. . . .",[4] and we take this to be based on the use of "Pigs Off Census" as a slogan on the sign held up at the table of the two supervisors, since there was no other verbal activity by appellants during their demonstration.

The District Court's "verbal assault" concept ahs a reference point in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), which sustained a conviction for the use of offensive language to a person lawfully in the street, on the ground that the New Hampshire Supreme Court had sharply limited the statutory language "offensive, derisive, or annoying word" to "fighting" words. See Gooding v. Wilson, 405 U.S. 518, 522–523, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). So-called "fighting words" are "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." Cohen v. California, 403 U.S. 15, 20, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284 (1971) (Harlan, J.).

---

2. The imposing nature of appellants' presence at the table is added to by the fact that Mr. Cooper was 5'11" tall, weighing 228 pounds, and on that date was wearing an ammunition style belt loaded with mock cartridges. Tr. 149–150.

3. This was pursuant to Civil Service Commission regulation Part 752, 5 C.F.R. § 752, and Department of Commerce Administrative Order 202–751.

4. 341 F.Supp. at 442.

■■ For purposes of First Amendment protection, we cannot equate the "Pigs Off Census" sign, as used in the circumstances of this case, with "fighting words". This slogan had been used previously in the lunchroom, without any indication that it might provoke a violent reaction on the part of other employees. The fact that words may offend the sensibility of some is not determinative. As Justice Harlan stated in *Cohen, supra,* at 21, 91 S.Ct. at 1786,

> The ability of the government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections.

In some cases, a different result can follow from directing the words at particular individuals as compared with a general audience, since the potential for provocation in the former event might be greater.[5] But the words in this case had acquired a certain currency in lunchroom demonstrations and since the two supervisors were "embarrassed" rather than subject to violent reaction, this is not such a case. *See* Lewis v. City of New Orleans, *supra* note 5, vacating and remanding a conviction where a police officer, while in the performance of his duty, was called "g--d--- m----- f------ police".[6]

### B. The Conduct

■ A different issue altogether is raised in evaluating the "conduct" of appellants at the table of the supervisors. Those who communicate ideas by conduct, such as picketing, are not afforded the same kind of freedom as those engaged in pure speech. Cox v. Louisiana, 379 U.S. 536, 555, 85 S.Ct. 453, 13 L. Ed.2d 471 (1965).[7] Peaceful picketing in a location open generally to the public is protected by the First Amendment, absent other factors involving the purpose or manner of the picketing, Amalgamated Food Employees Local 590 v. Logan Valley Plaza, 391 U.S. 308, 313, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). The picketing involved in the actions of appellants on July 16, 1971, however, carried with it a strong element of physical intimidation which brought it outside First Amendment protection. As

---

5. *Cohen, supra* at 20, 91 S.Ct. 1780, *citing* Cantwell v. Connecticut, 310 U.S. 296, 309, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). *See* Lewis v. City of New Orleans, 408 U.S. 913, 92 S.Ct. 2499, 33 L.Ed.2d 321 (1972) (Powell, J., concurring in the result).

6. This view is not at odds with that taken by the court in Von Sleichter v. United States, 153 U.S.App.D.C. 169, 472 F.2d 1244 (1972). The statute at issue in *Von Sleichter* proscribed "indecent or obscene words," and appellant's shout was in the presence of citizens on the street. As we indicated, *Williams v. District of Columbia,* 136 U.S. App.D.C. 56, 419 F.2d 638 (1969) (en banc), had given the statute a narrow construction, to apply only if the language is under " 'contemporary community standards,' so grossly offensive to members of the public who actually overhear it as to amount to a nuisance." 472 F.2d at 1257. Here the regulation had not been narrowed through application, nor can we say that "Pigs Off Census" would fall within a similarly narrowed definition.

Moreover, in *Von Sleichter,* 472 F.2d at 1247, we distinguished Cohen v. California, *supra,* on grounds applicable here, pointing out that:
> It involved a written, rather than a shouted, sentiment. Justice Harlan took note of this when he said that people who might be offended could avoid distress by modestly "averting their eyes." 403 U.S. 15 at 21, 91 S.Ct. 1780. Even as a written word it was part of a political statement concerning the draft, and the kind of language that may be held protected by the First Amendment in that context, with its paramount "redeeming social value," may not be protected in another context where its coarsely offensive nature is unrelieved.

7. *See* Women Strike For Peace v. Morton (II), 153 U.S.App.D.C. 198, 472 F.2d 1273, 1295 (1972), as to my views on the utility of the distinction between speech and speech-plus-action.

Justice Marshall stated in *Logan Valley Plaza, supra,* at 321, 88 S.Ct. at 1609.:

> Thus it has been held that persons desiring to parade along city streets may be required to secure a permit in order that municipal authorities be able to limit the amount of interference with the use of the sidewalks by other members of the public by regulating the time, place, and manner of the parade. [citations omitted].

Such "time, place, manner" restrictions on picketing fulfill a reasonable and significant function. It cannot seriously be claimed that society has no legitimate interest in restricting the kind of expression manifested or accompanied by acts with a significant potential for physical intimidation. *See* H. Kalven, Jr., The Concept of the Public Forum, 1965 Supreme Court Rev. 1, 23 (1965).

■ One must distinguish between embarrassment and fear in the viewer, between content of speech and form of expression, or accompanying behavior. The point can be sharpened by supposing that appellants had engaged in picketing in an orderly fashion at the bank of the lunchroom—a place and time not prohibited at the Bureau—but instead of carrying general signs "Pigs Off Census" had carried signs which identified Mrs. Stockwell and Mrs. Gans as persons responsible for "racist" or discriminatory behavior. Those two ladies might well have been upset by specific references to them, and possible ridicule, but the assertion that displaying the signs warranted suspension would raise difficult First Amendment issues. Certainly the government is in no position to say generally that it will allow free speech in a location but only of the kind it finds welcome or laudatory. Women

Strike for Peace, II supra, 472 F.2d at 1295–1296.

What makes this case different is that the conduct approached intimidation by being carried on at the table where the ladies were seated to eat the lunch they had bought. The difficulty, however, with the case before us is that the Census officials were not sensitive to First Amendment considerations, and did not carefully separate the speech and conduct components in analyzing the situation.

*C. Possibility that Bureau suspension was based essentially on content of speech, rather than solely on "manner of expression" and intimidating conduct.*

The complaint lodged against appellants (JA at 20), and the proceedings within the Department failed to make clear just which element of the events violated the regulation, and it is thus arguable that the suspension is attributable to the words of the sign as well as to pure conduct. The regulation in terms prohibits "improper language" as well as conduct. The Bureau's statement in response to questions of the appellants as to the nature of the complaint was as follows (JA at 35):

> The mere display of the sign is, in and of itself, not the issue in your case. Rather, the issue is whether your conduct, *considering the content of the sign,* the manner in which you displayed it, and the circumstances in which you displayed it, and the effect of your displaying it, amounts to misconduct which violates common decency in employee relations. (emphasis added).[8]

However, we cannot decide the case upon this formulation of the Bureau's posi-

---

8. In explicating the meaning of the words used in its charge, the Bureau quoted dictionary definitions which referred to language as well as action. The Bureau stated, inter alia:

"Decency" is defined by the Random House Dictionary of the English language, Unabridged Edition (1967), as "conformity to the recognized standard of propriety, good taste, modesty, etc., as in behavior or speech."

\* \* \* \* \*

"Ridicule," by the same source, means "speech or action intended to cause contemptuous laughter at a person or thing; derision." (J.A. at 34)

tion, but must rather look to the subsequent proceeding at which this position and the underlying facts were ventilated, the evidentiary hearing held at the direction of the District Court, and on which the appeals examiner focused in making his decision. The examiner's "Findings" stated the bare facts of appellants' conduct (Fdgs. 14–17) and then set forth the following:

18. The incident caused a silence to fall in the area immediately surrounding Sockwell's and Gans' table while spectators stared and strained to see what was happening. (Tr. 30, 52, 53, 57, 88).

19. Some of the spectators who were upset, shocked and surprised believed the incident humiliated Sockwell and Gans. (Tr. 34, 89, 98, 101).

20. The incident disrupted and prevented Sockwell and Gans from enjoying their lunch and resulted in their leaving their table and the cafeteria because of fear, embarrassment and humiliation. Sockwell and Gans statements, Exhs. X–1, X–2; Tr. 30, 32, 33, 35, 45, 48, 49, 51, 54).

The analysis of the appeals examiner is in his "Conclusion." Therein he states that "pig" has derogatory slang usage, and sets forth the following key point (J.A. at 82):

In any event, "PIG" is clearly a truculent epithet and it is understandable from this record how anyone who is anticipating a quiet lunch and suddenly, under unprecedented circumstances, becomes the target of an opprobious sign, could become apprehensive and upset.

Most significantly, the District Judge viewed the case as one of "verbal assault."

■ Although one finding of the appeals examiner used the word "fear" (Finding 20), and his Conclusion used the word "apprehensive," it is striking that neither the findings nor the analysis focus on the nature of the conduct, but are replete with material on the "humiliation" aspect of the incident. It

is not easy to draw the line, but a line must be drawn between (a) the content of the sign (and conduct that merely signifies that its message is directed at the two supervisors) which is asserted to be offensive because of the humiliation and ridicule it produces, and (b) some additional critical element of conduct which shows that the suspension is grounded on more than humiliating speech. In the last analysis, since the record as it stands leaves us unable to say with confidence that appellants' words were not a cause of their suspension, we must see whether a governmental interest could support the five-day suspension ordered for the use of these words. Street v. New York, 394 U.S. 576, 589, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969).

This approach is consistent with the teaching of Street, where the information charged defendant with igniting the flag and publicly speaking contemptuous words about the flag. The state statute made it a crime to cast contempt upon the flag by words or act. The Court held that the record was insufficient to eliminate the possibility that the defendant was convicted either for his words alone, or for both his words and his act, and that in either event, whether the words were a sole cause or a concurrent cause of the conviction, the conviction could not be sustained unless the words uttered were not protected speech.

## II. GOVERNMENTAL INTEREST IN RESTRICTING CONTENT OF SPEECH BY EMPLOYEES

As Judge Gesell noted in his opinion, "The Government's right to protect the efficiency of its service has frequently been recognized. Goldwasser v. Brown, 135 U.S.App.D.C. 222, 417 F.2d 1169 (1969)." This rule, recognized in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), must be applied to the specific facts of this case. Two considerations require discussion.

■ First, since the Bureau had for some time allowed the words "Pigs Off

Census" on signs carried in the course of demonstrations at the back of the lunchroom, the government cannot assert that the mere use of such words impair efficiency.

Second, this case is considerably different from others where governmental interests have been asserted. It is unlike Meehan v. Macy, 129 U.S.App.D.C. 217, 392 F.2d 822 (1968) (en banc), where there was both a special relationship (the policemen protecting the Governor) and a challenge to the superior (Governor) on an issue of international relations—in a situation fraught with threat of rioting by Panamanians over American occupation of the Canal Zone. It is also to be distinguished from *Goldwasser*, where there was disregard of assigned employment duties, with the court noting that an altogether different question would be presented by speech off-hours outside the classroom, 135 U. S.App.D.C. at 230, 417 F.2d at 1177. Unlike *Goldwasser*, this case does not involve "the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning", *Pickering, supra,* 391 U.S. at 570, 88 S.Ct. at 1735, since appellants had no contact in their work with the two women supervisors.

■ The asserted governmental interest here is a tranquil environment for government employees during their lunch hour, so that work might be more efficiently performed after the completion of lunch. Thus, the government points to the fact that the spectators, as well as the women supervisors, were upset by the events in question. We think that such a broad asserted interest could rule out any form of protest disturbing to employees in the lunchroom, or for that matter, on their way into work in the morning, if the protest took place outside the Bureau. The difficulty is that a man's right of free speech comprehends the possibility that persons may be upset by what he says. The permission for demonstrations in the lunchroom cannot be made to turn on refinements as to whether particular slogans are upsetting to some government personnel, particularly when what is at issue is the speaker's expression of his conviction that their activities are wrong and should be discontinued. What makes this case different is the issue of discomfort to the two supervisors due to the physical proximity of the two appellants at their table.

■ In our view, the disciplinary sanction meted out to appellants cannot be sustained if it was predicated, as a crucial ground of decision, whether sole, alternative or concurrent, on the mere content of the sign they displayed as part of their demonstration. Government employees have protection of First Amendment freedoms even when their speech is critical of or embarrassing to their superiors, albeit this doctrine is subject to certain limitations. Pickering, *supra*; Meehan v. Macy, *supra*. As already noted, the "fighting words" concept is an exception to protected speech, but we do not think the present record established a predicate for that exception. This is so even though the immunity of government employees from sanction is not necessarily co-extensive with the immunity of citizens from prosecution for speech on the public way.

■ On the other hand, there is no doubt that disciplinary sanction could rightly be applied to appellants' activity at the table, whether it is regarded as conduct or non-protected speech. While we have hitherto focused on the intimidation aspect of this activity, we note also that the government's interest in efficiency is interlocked with the government employees' reasonable right of privacy, which other employees of their department may not invade as of right. The issue is not the same as that faced when government officials seek to elevate personal privacy over freedom of comment by the outside press. The scope of reasonable expectation of privacy of a government employee awaits line-drawing and definition. It suffices here to say that while personal privacy

may have little weight when asserted at the entrance to the cafeteria, a public place where demonstrations and messages are part of the basic pattern of life, it claims appropriate protection at the luncheon table where the employee sits down, alone or with friends.

■■■ The present case is one where the state of the record leaves us to grapple with a sanction imposed on the conjunction of message and conduct. Here we face an intermediate problem of some complexity. This combination would preclude a criminal conviction under Street v. New York, *supra,* although the Supreme Court may have contemplated that words could be made part of the operative acts if they related solely to the intent of the action, 394 U.S. at 590, 89 S.Ct. 1354. But the criminal analogy is .not decisive. While we have no exact guidelines in Supreme Court jurisprudence, we think the basic needs of government may permit sanctions in cases of mixed conduct and speech where the speech, or written message, is of such character as to be a significant factor in the total effect of the conduct, and it is clear that the sanction is addressed to the effect of the conduct and not to content of the speech. It may well be that this is the situation before us, as viewed by the Census Bureau, but its analysis was not refined in this manner. We do not say that disciplinary action would necessarily be inappropriate under the facts of this case. But in our view the appropriate disposition is a remand, without a vacating of the order, to give the agency an opportunity to tailor its treatment of these employees to the particular activity which exceeds the bounds of First Amendment protection —the activity at the table. This would avoid the deterrence of legitimate speech. While the problem of overbreadth in the public employment sphere can raise First Amendment questions,

see Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), it does not necessarily require the same remedy as overbreadth in criminal statutes; specifically, it does not require either a prohibition of any and all penalties, or striking down the regulation, since in matters pertaining to "efficiency of the service" it may be impossible to avoid a broadly-worded regulation. Deterrence of legitimate speech must be minimized by proper application of the prohibition to activity not protected by the First Amendment.

We are fortified in our view that a remand is the proper disposition by considerations of fairness and notice to the employees, that the conduct at the table was prohibited. This leads us to appellants' "vagueness" challenge.

### III. CONSIDERATIONS OF "VAGUENESS"

Appellants claim lack of notice that their activity of July 16, 1971 would be a violation of the "common decency" regulation. They stress that they and others had previously demonstrated at the back of the cafeteria, and up and down the main aisles, sometimes with the slogan "PIGS OFF CENSUS," without any warning by the relevant authorities that this was illegal activity. They claim that this fact, together with the generally "vague" wording of the regulation, means the sudden suppression of their July 16 activity denied due process.

■■■ In view of the impracticability of defining more precisely what type of activity would be injurious to "efficiency of the service" the regulation is not *per se* at odds with the Fifth Amendment. Where criminal prosecution is not at issue, a broad regulation can be given content by the authorities through its proper application.[9] The necessity of "catchall" regulations as a

---

9. As we said in Meehan v. Macy, *supra,* 129 U.S.App.D.C. at 230, 392 F.2d at 835, "[I]t is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most

conscientious of codes that define prohibited conduct of employees includes 'catch-all' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.' "

matter of administrative convenience does not obviate, however, the need to give content to such prohibitions by warnings, which give the general regulations a requisite concreteness, alerting the employee to the activity prohibited. In this regard it is helpful to look once again at the facts of *Meehan* and *Goldwasser*.

In *Meehan*, the discharged policeman had been warned by his supervisor, the Personnel Director, "to avoid local issuance of comments or statements which could be used by the Panamanian press to inflame further the difficulties between the United States and Panama". 129 U.S.App.D.C. at 221, 392 F.2d at 826.[10] In *Goldwasser*, 135 U.S.App.D.C. at 224, 417 F.2d at 1171, appellant had been "repeatedly warned" by the Chief of the Language School that his conduct was prejudicial to the interests of the United States. In the instant case, there had been no warning of any kind, nor is there evidence in the record that appellants expected they would be sanctioned for the specific departure from the normal routine of lunchroom protest.

In Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), the Supreme Court found it "irrelevant that petitioners at one point testified that they had intended to be arrested," since the determination whether a statute affords "fair warning . . . must be made on the basis of the statute itself and the other pertinent law, rather than on . . . an ad hoc appraisal of the subjective expectations of particular defendants." 378 U.S. at 355–356 n. 5, 84 S.Ct. at 1703.

Our reasoning fully takes into account our recent decision in Avrech v. Secretary of the Navy, 155 U.S.App.D.C. 352, 477 F.2d 1237 (D.C. Cir. March 20, 1973). In that case the Court held void for vagueness Article 134 of the Uniform Code of Military Justice, which imposes criminal sanctions of up to 20 years imprisonment for "all disorders and neglects to the prejudice of the good order and discipline in the armed forces" and "all conduct of a nature to bring discredit upon the armed forces." The general language was held insufficient as the basis for defining criminal conduct.

 The action in our present context, a few days' suspension, though of some consequence to the employee, does not brand him as a criminal. Words considered too vague to define a crime may lay the foundation for lesser sanctions. However, the applicability of disciplinary sanctions to a violation of a regulation that would be an impermissible basis for prosecution presupposes that the particular conduct is clearly within the ambit of the regulation, even though there are other respects in which the regulation is ambiguous or vague. That is another issue to be thrashed out on remand, since appellants contend that the conduct resulting in their suspension was virtually identical to conduct previously tolerated. The appeals examiner put it that their activity in this case was "unprecedented," which is only to say that he found the differences from what had been permitted in the past to be greater than the similarities. But the problem was not analyzed in terms of such similarities and differences by the Bureau, and it has the primary responsibility.

 If the Bureau had proceeded by way of reprimand, this issue could have been undercut. The *Meehan* and *Goldwasser* cases illustrate this, since the court pointed out that the conduct there involved continued after warning. The specific warning removes any issue of ambiguity. The vagueness problem is diluted, even when there has been no specific warning implementing the general regulation, when the sanction has only the ambiguous quality of reprimand. It is the kind of administrative action that can fairly be used to betoken a determination that there has been poor judgment, as contrasted with a suspen-

---

10. Appellant Meehan claimed that this was a request and not a warning, but we rejected that distinction on the facts of the case.

sion, which betokens past misconduct. We do not say that an agency is necessarily limited to a reprimand when there has been no warning, but rather that when an agency proceeds by way of reprimand it substantially defangs the bite of a claim of unfairness due to vagueness.

In the present case there has been a suspension notwithstanding the lack of a specific warning. This cannot be sustained unless there is a determination, of fair notice to the employee, that requires further administrative consideration on remand.·

## IV. REMAND

In the interest of justice, 28 U.S.C. § 2106, this case is remanded to the District Court, to frame an order retaining jurisdiction pending further consideration by the Bureau of the Census. Meehan, *supra,* 129 U.S.App.D.C. at 234, 392 F.2d at 839; Van Bourg v. Nitze, 128 U.S.App.D.C. 301, 388 F.2d 557 (1967).

So ordered.

FAHY, Senior Circuit Judge, concurring:

In concurring in the opinion of Judge Leventhal for the court I add a few words. Due to the importance of the protection of free speech under the First Amendment, great care is required where disciplinary or punitive action is taken against anyone who claims the protection, but we do not exonerate the appellants. The Census Bureau is required, however, to appraise the situation anew, guided as the opinion requires as to the part the words of the sign might have played in the total conduct of appellants. As the opinion states, the disciplinary action meted out to appellants cannot be sustained if it was predicated on the mere content of the sign, solely, alternatively, or concurrently. On the other hand the opinion does not preclude a sanction based on mixed conduct and speech, where the speech, or written message, though itself protected by the First Amendment separately considered, is of such character as

to be a significant factor in the total effect of the conduct.

ROBB, Circuit Judge, dissenting:

I would affirm the judgment of the District Court on the opinion of Judge Gesell, reported as Waters v. Stans, 341 F.Supp. 441 (D.D.C.1972). I add only a few comments on the opinions of my colleagues.

(1) The majority opinion segregates the words of appellants' sign from their conduct in displaying it. Having accomplished this dissection the majority suggests that disciplinary action against the appellants may have been based upon the content of their sign, as distinguished from their conduct. From these premises the majority concludes that the case must be remanded since "the disciplinary sanction meted out to appellants cannot be sustained if it was predicated, as a crucial ground of decision, whether sole, alternative or concurrent, on the mere content of the sign they displayed as part of their demonstration." According to the majority the purpose of the remand is "to give the agency an opportunity to tailor its treatment of these employees to the particular activity which exceeds the bounds of First Amendment protection—the activity at the table."

In my opinion the appellants' actions and their sign were integral and inseparable parts of their harassment, intimidation and humiliation of the two supervisors. Separation of the sign from the conduct results in an unrealistic and artificial picture of their behavior.

Contrary to the suggestion of the majority the Bureau of the Census did not base its action on the words of the sign, standing alone. Thus, in his suspension letter to the appellants, the Chief of the Personnel Division said:

As you were informed previously, we do not question your right to display a sign, which in and of itself, is not the issue in the case. Rather, the issue is that your actions, considering the content of the sign, the manner and circumstances under which it was dis-

played, and the effect it could reasonably be expected to have, and did have, by singling out these two individual employees in the cafeteria, amounted to misconduct and violates common decency. (J.A. 47).

Similarly, Judge Gesell did not view the case as one of a mere "verbal assault", as stated by the majority. On the contrary, he said "What occurred in. this instance was a pointed verbal assault on fellow employees *singled out* for this purpose and *confronted* at the employees' place of work. Such *conduct* violates common decency, particularly when done, as is the case here, with the obvious intent to humiliate." 341 F. Supp. 441, 442 (1972). (Emphasis added). In short, I think the record establishes that the appellants' words were not an independent cause of their suspension. They were suspended for their conduct, considering the content of their sign.

(2) I think it is. not important that signs proclaiming "PIGS OFF CENSUS" had been carried in demonstrations at the back of the lunchroom. There is an obvious difference between such a general demonstration and the actions of the appellants which focused specifically on the two supervisors while they were having their lunch. The appellants did not have a constitutional right to make their protest whenever and however and wherever they pleased. *Cf.* Adderley v. Florida, 385 U.S. 39, 47, 48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). Specifically, in the circumstances they had no right to inflict their ugly behavior upon the two ladies.

(3) I find no impermissible vagueness in the regulation that the appellants violated. Nor do I think there was any reason for the Bureau to warn them that conduct such as theirs would subject them to discipline. Anyone with sense and sensibility enough to earn a salary from the government ought to know that such behavior is improper. *See* Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

(4) The majority seems to intimate that a reprimand of the appellants might be approved. I think the fashioning of an appropriate remedy is for the Bureau, not for this court. *Cf.* Butz v. Glover Livestock Commission Company, Inc., 411 U.S. 182, 93 S.Ct. 1455, 36 L. Ed.2d 142 (1973).

I respectfully dissent.