Robert Michael DAVIS et al.,
Plaintiffs-Appellees,

v.

Lewis WILLIAMS et al.,
Defendants-Appellants.

No. 77–1299.

United States Court of Appeals,
Fifth Circuit.

July 11, 1979.

---

* Senior Judge of the United States Court of Claims, sitting by designation.

Don J. Rorschach, City Atty., John W. Chandler, Asst. City Atty., Irving, Tex., for defendants-appellants.

Frederick M. Baron, Dallas, Tex., for plaintiffs-appellees.

Before GEWIN, GEE and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

"Silence," the King of the Turtles barked back, "I'm king, and you're only a turtle named Mack."[1]

Those in authority do not readily accept public criticism by their subordinates. They are particularly sensitive when employee censure brings their governance into public disrepute. Hence, employee comment about a superior is likely to lead to consideration of drastic retaliation, including instant dismissal.

Public employees, like the employees of those private industries whose management's prerogatives were not restricted by collective bargaining agreements, were long subject to discharge without cause. Even a patently reasonable expression of opinion about management was a dangerous step for employees in such a vulnerable position. Today, however, the power of private employers to discharge employees is often limited by bargaining agreements allowing discharge only for "cause," and the power of public agencies is circumscribed by doctrines protecting the exercise of first amendment rights. In this suit, now narrowed considerably by events in the trial court and by the scope of the present appeal, we consider the validity of a municipal ordinance and a fire department regulation that make fire department employees subject to discharge for "conduct prejudicial to good order." We declare the challenged

1. Seuss (T. Geisel), Yertle The Turtle and Other Stories, Random House (1950).

portions of the ordinance and fire department regulation unconstitutional for reasons set forth below.

## I.

In 1975, the Irving, Texas City Council decided to have firefighters operate a municipal emergency ambulance service. The firefighters' association thought this would require more additional firemen than were contemplated by the fire chief. At a city budget hearing, the chief advised the council that only a minimal increase in personnel would be needed. The association opposed his position, and took its stand: a number of additional firefighters would be required. Association representatives continued the debate in other public forums.

At a meeting of the firefighters' association, the membership voted to send a letter to the chief opposing his position and accusing him of "an inexcusable lack of concern for the lives and safety of the men under your command." The letter continued, "[Y]ou have made it your official policy to gamble, not only with our lives, but with the lives of all those under our protection," renounced his leadership and made other comments critical of his management of the department. The association also voted to send a copy of the letter to each member of the city council and to the local newspaper. Davis, one of the plaintiffs-appellees, was directed, as president of the association, to obtain the signatures of at least 51% of the membership, and then to release the letter.

Having learned that the letter was being circulated, local newspapers investigated the apparently newsworthy situation. A reporter approached the chief, who declined comment. The chief telephoned Davis, however, to remind him that the fire department had established grievance procedures. The reporter then interviewed Davis, who discussed the controversy in detail. His comments generated additional friction between the firefighters and the chief when they were featured the next day on the front page of the Irving Daily News.[2]

The chief considered his authority threatened by this spark of independence from the lower echelons of the department, and therefore consulted the city attorney regarding his power to punish Davis. He then suspended Davis indefinitely by a written order, which cited as authority both the fire department rules and regulations,[3] and ordinance No. 2201, which sets forth in Section 37 as grounds for removal or suspension:

(8) Conduct prejudicial to good order;

\* \* \* \* \* \*

---

2. The story was headlined, "Firemen Mull Criticism of Chief," and provided, in part:

IPFFA president Mike Davis said the "morale of the fire department has steadily dropped since the chief has assumed the leadership of the department more than eight years ago."

"We feel the chief has never really assumed his leadership responsibilities, and as a result of his eight years as chief, the morale of the department is at an all-time low," says Davis.

"We realize this (the letter) is a serious measure and may permanently sever our relationship with the chief, but we wish to bring this situation to the attention of city management and the general public."

3. The pertinent provisions are:

IRVING DEPARTMENT OF FIRE
RULES & REGULATIONS
ARTICLE 5.3 MEMBERS
\* \* \* \* \* \*
All members (employees) shall:
\* \* \* \* \* \*

(41) Refrain from being a party to any malicious gossip, report, or activity that would tend to disrupt department morale or bring discredit to the department or any members thereof; or making derogatory statements or adversely criticizing department policy, activities, or officers, except by written report to the Chief of the Department, through channels.

\* \* \* \* \* \*

ARTICLE 5.5 OFFENSES

Offenses are punishable by reprimand, reduction in rank, suspension, or dismissal.
A. Offenses
\* \* \* \* \* \*
(5) Conduct prejudicial to good order.
\* \* \* \* \* \*

(9) Violation of any of the Rules, Regulations, or Procedures of the Fire Department; Civil Service Rules and Regulations; City Charter; City Ordinances; Personnel Rules and Regulations of the City of Irving; and County, State, or Federal laws.

(14) Violation of any of the rules and regulations of the Fire Department and Police Department or of special orders, as applicable, and/or these rules and regulations.

After reciting the facts leading up to Davis' statement to the newspaper and quoting his comments, the order concluded:

> In this article, a copy of which is attached hereto, Robert Michael Davis is quoted repeatedly criticising my leadership as Chief and making statements that have certainly tended to disrupt department morale.
>
> Based upon an overall review of the conduct of Fire Equipment Operator II, Robert Michael Davis in this matter, including the violations of the Fire Department Rules and Regulations and City of Irving Ordinance No. 2201, I have given Fire Equipment Operator II, Robert Michael Davis an indefinite suspension for each such separate action and violation.

This ignited the conflagration. Davis and the association sued contending, among other things, that the ordinance and regulations are vague, overbroad and facially unconstitutional under the first and fourteenth amendments. The district court held that they were unconstitutional, both facially and as applied to Davis. It therefore enjoined their enforcement and ordered Davis' reinstatement, with costs and attorney's fees taxed to the defendants. On appeal, the chief, the commission and the city contest only that portion of the judgment that holds invalid the rule and ordinance against "[c]onduct prejudicial to good order" and enjoins their enforcement. We are thus to determine whether such a provision governing the behavior of municipal firefighters is so vague or overbroad as to offend the Constitution.[4]

## II.

The issue is, therefore, presented in an unusual and narrow context. No appeal has been taken from the injunction that forbids the enforcement of Article 5.3 of the Fire Regulations, the "derogatory statements—adverse criticism" provision set forth in footnote 3 above. Presumably the ordinance and Article 5.5 forbid only that kind of "[c]onduct prejudicial to good order" not forbidden by the more specific provisions of Article 5.3. In any case, the city cannot now penalize, under these catch-all provisions, conduct it has been forbidden to punish under Article 5.3.

This narrow ledge is treacherous for the defendants, however, for the city nevertheless asserts, in effect, that it may punish some kinds of conduct expressive of opinion. Certainly some prejudicial conduct is not communicative in nature, e. g., striking a superior or stealing his car. However at least one objective of the conduct-prejudicial-to-good-order standard is apparently to forbid the kind of conduct that expresses an idea or a thought—the kind of behavior that is communicative and hence shielded by the first amendment.[5] Article 5.3 may

---

4. The city has not appealed the court's decision that the ordinance and regulation were unconstitutionally applied.

5. "The trouble with the distinction between speech and conduct is that it has no real content. All communication except perhaps that of the extrasensory variety involves conduct." Tribe, American Constitutional Law (1978) 599. The Supreme Court has recognized this in a wide variety of circumstances, including contributing money, *Buckley v. Valeo*, 1976, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659; displaying a flag with a peace symbol attached, *Spence v. Washington*, 1974, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842; wearing a sign on the back of a jacket, *Cohen v. California*, 1971, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284; wearing arm-

bands, *Tinker v. Des Moines Ind. Com. Sch. Dist.*, 1969, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; engaging in demonstrations, *Edwards v. South Carolina*, 1963, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697; engaging in litigation, *NAACP v. Button*, 1963, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405; saluting the flag, *West Virginia State Bd. of Educ. v. Barnette*, 1943, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628; and displaying a red flag, *Stromberg v. California*, 1931, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117.

That symbols and conduct are designed to communicate is, indeed, recognized both by those who favor and those who oppose particular kinds of conduct: prayer in public schools has adherents and opponents not merely because of the words used but also because of the nature of the communication to other human

remove some such conduct from coverage under Article 5.5, but conduct of this nature is still substantially encompassed by the latter article. For example, disclosure of a secret department policy, criticism of the mayor or picketing of the fire department with signs saying "Firefighters are underpaid," might result in sanction under Article 5.5, but not under Article 5.3.

 Thus the municipal code has, on its face, at least some application to conduct that would be considered "speech" under the first amendment. That impact cannot be dismissed as tangential or even minimal. There is potentially a wide difference between "conduct prejudicial to good order" and activities "that would tend to disrupt department morale", or other conduct of the kind mentioned in 5.3. Moreover the power to discharge for activity a superior considers prejudicial to good order cannot be sanctioned on the thesis, once acceptable, that a public employee is subject to sanction or discharge at his superior's whim. Even though an untenured teacher can be discharged "for no reason whatsoever," he must be reinstated "if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms." *Mt. Healthy City School District Board of Education v. Doyle,* 1977, 429 U.S. 274, 283–84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471, 481. Nor may continuance in public employment be based on political adherence. Municipal employees may not be discharged pursuant to a legislative scheme that broadly stifles the exercise of fundamental personal liberty. *Elrod v. Burns,* 1976, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547. Even on the narrower ground asserted by the concurring opinion in *Elrod,* a "nonpolicymaking, nonconfidential government employee can[not] be discharged . . . from a job that he is satisfactorily performing upon the sole ground of his political beliefs." *Id.* at 375, 96 S.Ct. at 2690, 49 L.Ed. at 566 (Stewart, J. concurring in the judgment). We conclude

that such an employee cannot be discharged for the exercise of other first amendment rights.

### III.

These considerations limit the effect that could constitutionally be given to the ordinance. They do not directly address its validity as overbroad and vague. The question whether such a general standard for discipline of public employees is valid was confronted in *Arnett v. Kennedy,* 1974, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15. The Court there considered a provision of the Lloyd-LaFollette Act, 5 U.S.C. § 7501, which provides that a federal civil service employee may be removed or suspended without pay "only for such cause as will promote the efficiency of the service." The statute was upheld on the premise that its language "excludes constitutionally protected speech, and that the statute is therefore not overbroad." 416 U.S. at 162, 94 S.Ct. at 1648, 40 L.Ed.2d at 38. Moreover, the Court emphasized the interpretative history of the statute, the availability of government counsel to employees who seek advice on the interpretation of the act and its regulations, and the administrative interpretation of the statute by the Civil Service Commission, whose "longstanding principles of employer-employee relationships, like those developed in the private sector, should be followed in interpreting the language used by Congress." 416 U.S. at 160, 94 S.Ct. at 1647, 40 L.Ed.2d at 36.

Similarly, in *Parker v. Levy,* 1974, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439, while the Court held valid provisions of the Uniform Code of Military Justice proscribing "conduct unbecoming an officer and a gentleman," (10 U.S.C. § 933) and "all disorders and neglects to the prejudice of good order and discipline in the armed forces," (10 U.S.C. § 934) it stressed that each of these articles had been:

beings of implicit belief in a certain order of things. The thumbed nose, the projected middle finger, the bronx cheer, the grimace and the smile are all conduct—conduct intended to con-

vey a message that is sometimes made even more expressive by its bold freedom from a garb of words.

construed by the United States Court of Military Appeals or by other military authorities in such a manner as to at least partially narrow its otherwise broad scope.

\* \* \* \* \* \*

The effect of these constructions of Arts. 133 and 134 by the Court of Military Appeals and by other military authorities has been twofold: It has narrowed the very broad reach of the literal language of the articles, and at the same time has supplied considerable specificity by way of examples of the conduct which they cover.

*Id.* at 752, 754, 94 S.Ct. at 2560–61, 41 L.Ed.2d at 456–457. The Court also noted that military personnel were instructed regarding the contents of the Code. *Id.* at 751–52, 94 S.Ct. at 2559, 41 L.Ed.2d at 454. Moreover the Court stressed the "factors differentiating military society from civilian society" and held that the proper standard of review for a vagueness challenge to the articles of the Code is the standard that applies to criminal statutes regulating economic affairs. *Id.* at 756, 94 S.Ct. at 2562, 41 L.Ed.2d at 458.

■ It is implicit in the majority opinions in *Arnett* and *Parker* that standards of the kind we are considering are both vague and overbroad absent limitation or guidance regarding their scope. *See also Smith v. Goguen,* 1974, 415 U.S. 566, 580–81, 94 S.Ct. 1242, 1251, 39 L.Ed.2d 605, 616; *Broadrick v. Oklahoma,* 1973, 413 U.S. 601, 617–18, 93 S.Ct. 2908, 2918–19, 37 L.Ed.2d 830, 842–843; *United States Civil Service Commission v. National Association of Letter Carriers,* 1973, 413 U.S. 548, 579–80, 93 S.Ct. 2880, 2897–98, 37 L.Ed.2d 796, 816–817; *Bence v. Breier,* 7 Cir. 1974, 501 F.2d 1185, 1188–92, *cert. denied,* 1975, 419 U.S. 1121, 95 S.Ct. 804, 42 L.Ed.2d 821; *Waters v. Peterson,* 1973, 161 U.S.App.D.C. 265, 273–274, 495 F.2d 91, 99–100. *See generally*

Note, *Vagueness Doctrine,* 53 Tex.L.Rev. 1298 (1975). None of the factors that the *Arnett* and *Parker* opinions mentioned as providing such limitation or guidance are found here. There are no limiting regulations; there is no body of doctrine; there is no office for interpretative guidance; the rule applies to fire department employees not military personnel,[6] and no judicial construction of the ordinance and regulation can eliminate their overbreadth and also provide the requisite degree of clarity. Therefore the ordinance and regulation are facially overbroad and vague. We need not pause here to define the differences between these defects. *See, e. g., Coates v. City of Cincinnati,* 1971, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214, distinguishing the first amendment basis of the overbreadth doctrine from the due process grounding of the vagueness doctrine.

## IV.

■ No organization, public or private, can operate anarchically. The group must have direction, unity of purpose and responsiveness to management. Policy makers must be able to define and accomplish functional goals. Administrators must be able to direct work and to discipline the insubordinate, the idle and the insolent. We recognize that: "[I]t is not feasible or necessary . . . to spell out in detail all that conduct which will result in retaliation," *Arnett, supra,* 416 U.S. at 160, 94 S.Ct. at 1648, 40 L.Ed.2d at 37, *quoting Meehan v. Macy,* 1968, 129 U.S.App.D.C. 217, 230, 392 F.2d 822, 835, *modified,* 138 U.S.App.D.C. 38, 425 F.2d 469, *aff'd* en banc 1969, 138 U.S.App.D.C. 41, 425 F.2d 472. However certain minimum standards or guidelines are required. *See Smith v. Goguen, supra.* Management prerogatives can be defined in a manner that makes clear the duties and responsibilities of public employees and yet protects their rights as citizens.[7] In an

---

**6.** The military analogy has been rejected with respect to police departments. *See Bence v. Breier, supra,* and *Muller v. Conlisk,* 7 Cir. 1970, 429 F.2d 901, 904. Fire departments are also not analogous to the military.

**7.** The degree of specificity required of such regulations may depend on the nature of the employees covered. If a large, heterogeneous group of employees is involved, such as in

industrial society, discharge or suspension are penalties more severe than those levied for many criminal offenses; they cannot be left to the caprice of a supervisor, particularly when action may be taken, as it was against Davis, for communication protected by the first amendment.

■ For these reasons, the judgment is AFFIRMED.[8]

GEE, Circuit Judge, dissenting:

As the majority correctly notes, the curious feature of this case, and that which greatly narrows the question it presents, is the outstanding injunction against all appellants—the portion of the judgment below that was not appealed from. Under it appellants stand forbidden to enforce Article 5.3 of the Fire Regulations, the "derogatory statements—adverse criticism" provision. Thus, at present, insofar as is material to *this* case against *these* appellants, the prohibitions of Article 5.3 must be viewed as subtracted from the more general, catch-all language of the ordinance penalizing "[c]onduct prejudicial to good order" that is before us. Manifestly, the city cannot penalize, under the catch-all provision, conduct that it has been forbidden to penalize under the more specific Article 5.3. To do so would be to trifle with the court below. I therefore conclude that, since the injunction against enforcing Article 5.3 protects almost all conceivable speech and activity

shielded by the first amendment, these forms of expression are generally withdrawn from the catch-all prohibition as well.[1]

In this posture of the record, then, first amendment considerations largely depart this particular case and with them most, probably all, of the questions of overbreadth that stem from those considerations. *See, e. g., Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), distinguishing the first amendment basis of the overbreadth doctrine from the due process grounding of the vagueness one.[2] We are thus left to determine whether, first amendment matter aside, the ordinance is such that firemen of common intelligence must necessarily guess—at their peril—at its meaning. A corollary question is whether, if this be so, the level of guessing required here is such as to offend due process. I would hold that it is not.

The majority holds that it is because, as I understand the opinion, the majority thinks it can conceive of some types of "conduct expressive of opinion" that might fall outside Article 5.3 but within the prohibition of "conduct prejudicial to good order." Since it can do so, it proceeds to invalidate this ordinance as *facially* unconstitutional. If my experience is any criterion, today's judgment will require the revision of a very great many, perhaps all, sets of fire (and,

---

*Arnett, supra,* where most federal employees were subject to the regulations in question, less specificity may be feasible than for a small, homogeneous group of employees such as municipal firefighters. *See generally* Note, *Vagueness Doctrine,* 53 Tex.L.Rev. 1298 (1975).

8. Dr. Seuss' rhyming narrative about Yertle, The Turtle, concludes:
 "And the turtles. of course . . .
 All the turtles are free
 As turtles and, maybe, all creatures should be."
Seuss, *op. cit.* note 1. We do not extend the doctrine of protected activity *so far as to* suggest that all public employees are free to say and do whatever they choose. Boundaries for conduct may be set by regulations that provide ascertainable standards and are sufficiently limited so they do not chill the exercise of first amendment rights.

1. Thus the posture of Article 5.5 before us is as though it read, insofar as pertinent:
 Conduct prejudicial to good order is punishable by reprimand, reduction in rank, suspension or dismissal; *provided,* that it shall not be deemed such conduct to
 (1) engage in malicious gossip, reports or activity that would tend to disrupt department morale or bring discredit to the department or any member thereof;
 (2) or make derogatory statements or adversely criticize department policy, activities, or officers.
 This somewhat curious effect is the result of the failure of the city et al. to appeal from the other portions of the judgment.

2. Despite their different bases, the doctrines overlap considerably. *Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

perhaps, police) regulations in the circuit, since for reasons I note later such "conduct-to-the-prejudice" provisions seem to be very common. This is a most serious interference with state and municipal power and practical policy, taken on what I regard as quite strained and abstract grounds. If the majority is right, of course, the thing must be done; but even so, it should be done with deep reluctance.

I am the more reluctant to see it done because I think the majority is probably not right. The basis of its ruling is imagined types of "expressive" conduct—none claimed to be involved here—which might fall outside the scope of the enjoined Article 5.3 (derogatory statements/adverse criticism) but within Article 5.5 (conduct prejudicial). I doubt that such types of conduct exist to any significant degree in the real world, and my doubts are reinforced by the illustrations the opinion offers. These appear around its note call 5 and in that note, and I must suppose that they are the most likely examples that occurred to my brethren. Certainly, none of these are presented by this case, and, with one possible exception, all of them seem to me to be illustrations either of the kind of conduct protected by the injunction against enforcing Article 5.3 or of the kind that ought not to be protected at all. In the latter category, and probably in the first as well, falls "disclosure of a secret department policy" and thumbing the nose, "giving the bird," or directing Bronx cheers at one's superiors. In the former falls advertising a pay grievance, surely precisely that "adversely criticizing department policy" that the injunction protects. See Article 5, redacted at note 1 to this dissent.

There remains "criticism of the mayor," which is arguably protected by the injunction (if malicious, clearly so) and which to the extent it is not, is so clear and pure an example of political speech that only a true perversion of the prohibition of "conduct prejudicial to good order" could be thought to cover it. After all, any rule governing conduct can be perverted or deviously applied, and such *applications* should meet their due reward. As an illustration: suppose a fire department rule that "Firemen shall, while on duty, maintain a courteous and respectful demeanor toward their superiors and obey their instructions promptly." It seems unlikely to me that the majority would invalidate this rule *on its face* as violative of the first amendment. Yet it, though somewhat narrower than Article 5.5, could as easily be twisted to punish on-duty "criticism of the mayor."

Catch-all provisions such as this persist in military and civil-service codes, though often challenged and sometimes invalidated on grounds such as those asserted here. *See, e. g., Bence v. Breier,* 501 F.2d 1185 (7th Cir. 1974), and generally, Note, *Vagueness Doctrine,* 53 Tex.L.Rev. 1298 (1975). The reason why they do seems manifest. For in private employment, one can be disciplined or discharged for almost any reason or for no reason, and that this arrangement obtains is generally known. In civil service employment, by contrast, discharge and discipline generally must rest on "cause." Fair notice consequently requires some specification of what actions constitute cause, but it may well be impossible for the mind to imagine or the hand to transcribe every sort of human misconduct that might fairly call for disciplining. And if it were, the product would doubtless fill volumes of particulars and therefore go unread—except perhaps by superiors searching out support for disciplinary action already determined upon.

Thus, ironically, these catch-all provisions, so often attacked and here stricken down on "notice" and vagueness grounds, probably give the only notice that can practically and effectively be given that the employer thinks himself entitled to impose punishment on grounds that cannot practically be set out with particularity. They "require . . . a person to conform his conduct to an imprecise but comprehensible normative standard." *Coates v. Cincinnati,* 402 U.S. at 614, 91 S.Ct. at 1688. Thus, in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Supreme Court upheld a civil service dismissal for "such cause as will promote the efficiency

of the service." It did so on reasoning that the quoted standard was "essentially fair" and that requiring greater specificity was not feasible "Because of the infinite variety of factual situations in which *public statements* by Government employees might reasonably justify dismissal for 'cause.'" *Id.* at 161, 94 S.Ct. at 1648. (emphasis added). And in *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974)—a case concerning political speech and symbolic conduct almost exclusively—the Court sustained against a vagueness challenge Article 134, Uniform Code of Military Justice, which contains language almost identical to that attacked here, "disorders and neglects to the prejudice of good order . . . ." Were the Irving Fire Department a military unit, I would regard *Levy* as controlling authority, closely in point.

But it is not. The fire department is at most quasi-military and partakes even of this quality chiefly when on duty. The Court did rely strongly, in *Levy,* on the military context and tradition, and I am loath to equate a municipal fireman with a paratrooper or even with such a quasi-soldier as the recalcitrant officer-dermatologist, Levy. Military society, to function at all, appears inexorably to work itself out at least partly in terms of status and to require something more in terms of performance than mere efficiency, of conduct than mere failure to stampede the carriage horses. I do not, therefore, regard *Levy* as squarely controlling. *Kennedy,* however, does not concern the military, and the catch-all language there upheld could scarcely be broader.

It is certainly possible, as the majority does in passing, to isolate discrete elements within the analysis: size of the unit to be controlled; disparateness of function within it; the need for discipline, on or off the job, etc. The majority correctly notes, moreover, certain differentiating features of both cases: the presence of underlying regulations and available counsel in *Kennedy,* the military context and "partially" narrowing military court decisions in *Levy.* The central fact remains that in both cases pure *speech* was held validly punished under provisions as vague as this, and in *Levy* speech of a mostly political nature. I do not believe that the considerations noted by the majority suffice to transport the faintly military fireman outside the boundaries laid down in *Levy* and *Kennedy.* For me, he lies somewhere within them. I would therefore reason between these lines, since it seems to me that the Irving Fire Department lies well within them. *Levy* concerned speech and conduct near to the core values of the first amendment. All the same, it was punished, and punished pursuant to a rule as vague as this one.

And when first amendment considerations are not involved, as they mainly are not here, I do not think that advising a fireman that he may be disciplined for behaving himself in a manner "prejudicial to good order" requires him to do unconstitutional guessing or infringes his constitutional rights. To the contrary, such a rule does no more than give him notice that as a public servant he is expected to observe something approaching the norms of decent conduct. True, the standard is not precise, but I do not think it incomprehensible.

When firemen are disciplined under it for having a beer off duty, for wearing green nightshirts in the firehouse, or for criticizing the mayor, the courthouse doors should be open. Until such things are done, I see no need to conceive imaginary bugbears, drag them in by the heels, and invalidate this common-sense and, I fancy, widely used provision because of them. I am glad it does not fall to me to draft the new Irving Fire Code. I would reverse.