623 F.2d 845
 Ronald J. AIELLO, Appellant,
v.
The CITY OF WILMINGTON, DELAWARE and Thomas C. Maloney,
Individually and as Mayor of the City of Wilmington,
Delaware; the Department of Public Safety of the City of
Wilmington, Delaware and Norman Levine, Individually and as
Commissioner of the Department of Public Safety of the City
of Wilmington, Delaware; Wilmington Bureau of Fire and John
J. Malloy, James P. Blackburn, Francis X. Malloy, Ralph F.
DiOrio, Francis DiMichele and F. Thomas Savage, Individually
and as officers of the Wilmington Bureau of Fire.
 No. 79-1699.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 12, 1979.
Decided May 1, 1980.
As Amended May 7, 1980.
 
 John S. Grady (argued), Bader, Dorsey & Kreshtool, Dover, Del., for appellant.
 Jeffrey S. Goddess, City Sol., City of Wilmington Law Dept., Charles H. Toliver, IV (argued), Wilmington, Del., for appellees.
 Before ADAMS, ROSENN and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 This appeal presents for review the issue of the constitutionality of restrictions imposed on the conduct and speech of municipal firemen. Here a fireman challenges the validity under the first amendment of certain regulations of the Wilmington Fire Bureau. In addition, he presents us with the question whether a trial judge may restrict communication between an attorney and client during the period the client is under cross-examination.
 
 I.
 
 2
 The City of Wilmington employed Ronald J. Aiello as a fireman from June 3, 1966, until November 7, 1975. On the evening of January 30, 1973, he became intoxicated and broke into a retail store in Wilmington, the Record Museum.[1] He was found lying on the floor in the store by two policemen. Aiello remembers saying to the policemen that he was a city fireman or "please don't arrest me." The policemen disregarded his plea, arrested him, and subsequently charged him with burglary. Thereafter, the State nolle prossed the criminal charges then pending against Aiello because there appeared to be a reasonable doubt whether he had sufficient intent to commit a crime.[2]
 
 
 3
 While he was in jail Aiello was informed by Assistant Fire Chief Francis H. DiMichele that he was forthwith suspended from the Bureau of Fire pursuant to section 169.16 and 169.23 of its Rules and Regulations. Those rules require a fireman under penalty of dismissal, suspension or demotion:169.16. To refrain from conduct unbecoming a fireman and a gentleman whether on or off duty.
 
 
 4
 169.23. Be governed by the customary rules of good behavior observed by law-abiding and self-respecting citizens. Regardless of the time or place, whether in uniform or not, members shall conduct themselves in a manner that will not bring discredit to themselves or to the Department.
 
 
 5
 Subsequently, Aiello was instructed by Fire Chief John J. Malloy to report to his fire station twice per day during the period of his suspension.[3]
 
 
 6
 After the state's decision not to prosecute the charges against him, Aiello received two Charges and Specifications dated April 25, 1973, from the Fire Bureau. These charged him with violations of Rules 169.16 and 169.23 respectively. The charge under Rule 169.16 alleged that
 
 
 7
 Aiello failed to conduct himself in a manner conducive to good conduct and behavior. This unprofessional action reflects on his creditability as an employee of the Department of Public Safety as required by the Rules and Regulations of the Bureau of Fire.
 
 The section 169.23 charge alleged:
 
 8
 Fireman Ronald Aiello did not govern himself by the customary rules of good behavior observed by law-abiding citizens and self-respecting citizens, but instead, conducted himself in a manner that brought discredit both to himself and to the Department of Public Safety.
 
 
 9
 All members of the Bureau of Fire must at all times maintain the highest standard of respect for others, both in nature of trust and confidence. By being found inside the Record Museum, after they were closed for business, you have, in the eyes of the public and the department, placed an obstacle to total trust and confidence so urgently needed in our line of duty.
 
 
 10
 Above action has damaged the good name of the Department by failure to observe rules of law-abiding citizens, created distrust in performance of duty in the eyes of all members of the Department of Public Safety.
 
 
 11
 A hearing on the charges was conducted on May 8, 1973, before a trial board consisting of Deputy Chief Malloy, Assistant Chief Francis DiOrio, and Captain F. Thomas Savage, all named as defendants in this action. Although Aiello pled not guilty to the two charges he did not dispute the allegation that he had been found unaccountably sprawled inside the Record Museum.
 
 
 12
 In his defense Aiello argued that he did not intentionally or effectively violate the "high standard" required of firemen and had not brought discredit upon Wilmington's fire department. The district court characterized the "main import" of Aiello's testimony, as one of
 
 
 13
 personal problems stemming from family conflicts (which) placed him under heavy emotional stress, resulting in excessive drinking and culminating in the Record Museum incident. He also offered medical evidence to show that his current mental condition was not such that he could not completely perform his duties as a fireman. It was additionally noted that he was undergoing therapy on an ongoing basis to prevent any similar occurrence.
 
 
 14
 Aiello v. City of Wilmington, 426 F.Supp. 1272 (D.Del.1976).
 
 
 15
 The Board found Aiello guilty as charged. As punishment, the Board imposed several sanctions:
 
 
 16
 (1) one thousand hours penalty time on each of the two charges for a total of two thousand penalty hours;
 
 
 17
 (2) forfeiture of his salary from the date of suspension, January 30, through the date of the hearing, May 8; and
 
 
 18
 (3) reinstatement as of May 9, with probationary status until all penalty hours had been expended, and the stipulation that the probation period would in no event be less than two years from May 9, 1973.
 
 
 19
 The Board also stated that any further violation of the two rules during the probationary period would result in his dismissal.
 
 
 20
 Aiello retired from service with the Fire Bureau because of psychiatric disability in November 1975. Prior to his retirement he had completed working a large portion of the penalty hours without pay.
 
 
 21
 In the meantime, Aiello filed a complaint on October 21, 1974, in the United States District Court for the District of Delaware, under 42 U.S.C. § 1983, initiating the instant action. He sought injunctive and declaratory, as well as monetary, relief on behalf of a class of similarly situated firemen.[4] The amended complaint alleged, inter alia, that "Rule(s) 169.16 and . . . 169.23 are unconstitutional in that they constitute an invasion of privacy in violation of the First, Ninth, and Fourteenth Amendments and furthermore they are overly broad and vague in violation of the First and Fourteenth Amendments." The amended complaint also alleged that "Bureau of Fire Rule 170.7 which bars gossiping about a member of the Department of Public Safety, and Rule 170.8 which prohibits criticizing an official action of a superior officer are unconstitutional in that they are vague and overbroad in violation of the First and Fourteenth Amendments."[5]
 
 
 22
 The defendants moved for summary judgment on all issues. Aiello cross-moved for summary judgment on his first amendment claims and two other issues not relevant here. The district court granted the defendants' motion with respect to all but two issues and entered summary judgment for the defendants.[6] The summary judgment disposed of all the first amendment claims before us.
 
 
 23
 The district court held that Aiello lacked standing to challenge Rules 169.16 and 169.23 for vagueness because he was "the perpetrator of 'hard (core) conduct which any reasonable person must know would be cause for discipline or dismissal from employment.' " Aiello v. City of Wilmington, supra, 426 F.Supp. at 1293. The court also rejected Aiello's overbreadth attack on these rules. The court held that Aiello had failed "to satisfy the prerequisite for overbreadth consideration in two respects." Id. First, the court found it "questionable whether his conduct fell within the purview of First Amendment activities, the cornerstone of the overbreadth doctrine." Id. "More importantly," the court noted, "(t)here is little doubt that in the present case Rules 169.16 and 169.23 legitimately apply to a substantial amount of conduct or number of activities which properly may be proscribed, and the overbreadth, if any, of the rules is marginal." Id. at 1293-94. Finally, the court found Aiello's allegations of chill to be merely subjective and thus that he lacked standing to challenge the Rules' constitutionality. Aiello filed a motion seeking reconsideration of the court's ruling that Rule 169.23 was not unconstitutionally overbroad in light of this court's decision in Gasparinetti v. Kerr, 568 F.2d 311 (3d Cir. 1977).[7] That motion was denied.
 
 
 24
 In May 1978, the case was tried to a jury on the remaining substantive issues: whether the penalty imposed on Aiello by the Trial Board was unreasonable and violative of substantive due process and whether he had been denied procedural due process. The jury found for the defendants on those issues and the court denied Aiello's motion for a new trial. Aiello appealed.
 
 II.
 
 25
 On appeal, Aiello argues that his first amendment attack on the Bureau of Fire rules should be considered with respect to two distinct time periods. The first is the period commencing with the incident of January 30, 1973, and extending until his Trial Board hearing of May 9, 1973. The second is during the period in which he was on probation, i. e., from the date of the hearing until his ultimate retirement from the fire department in November, 1975.[8] We will consider each of these in turn.
 
 
 26
 As to the earlier period, Aiello contends that his conduct in entering the Museum and taking any goods was not intentional. He relies on testimony by the psychiatrist that, at the time Aiello smashed the Museum window, he had an "acute disassociative reaction with paranoid symptoms." Aiello claims that because his conduct was unintentional it did not constitute "hardcore conduct," and therefore the district court erred in holding that he did not have standing to challenge the Rules for vagueness.[9]
 
 
 27
 It is well-settled in American jurisprudence, that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess as its meaning and differ as to its application, violates the first essential of due process of law." Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Underlying this rule are concerns that individuals be afforded fair notice of proscribed conduct and that reasonably specific standards be set forth to guide the actions of law enforcement officials. See L. Tribe, American Constitutional Law (1978) at 718. In the first amendment context, such statutory vagueness is particularly objectionable because it may discourage or "chill" the exercise of protected first amendment rights. "Those . . . sensitive to the perils posed by . . . indefinite language, avoid the risk . . . only by restricting their conduct to that which is unquestionably safe." Baggett v. Bullitt, 377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1963).
 
 
 28
 In asserting claims of unconstitutional overbreadth, a litigant whose speech or conduct may not itself be constitutionally protected may assert the rights of hypothetical third parties whose protected activities might be chilled by the statute. See Note, Standing to Assert Constitutional Jus Tertii, 88 Harv.L.Rev. 423, 424 (1974).[10] When raising a claim of unconstitutional vagueness, however, the rule is otherwise. In the latter instance, the litigant must demonstrate that the statute under attack is vague as applied to his own conduct, regardless of its potentially vague application to others. Thus, when a litigant's conduct clearly falls within the permissible purview of a statute, such an individual lacks standing to challenge the statute for vagueness, even though the statute may well be vague as applied to others.
 
 
 29
 In Civil Service Commission v. Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), the Court rejected, inter alia, a vagueness challenge to section 9(a) of the Hatch Act, 5 U.S.C. § 7324(a)(2), which prohibits federal employees from taking "an active part in political management or in political campaigns." The Court noted that the scope of the statute had been somewhat defined and narrowed through "longstanding interpretations" by the Civil Service Commission. 413 U.S. at 575, 93 S.Ct. at 2895. Guided by these interpretations, the Court found that the terms of the statute were such that "the ordinary person exercising common sense can sufficiently understand and comply with, without sacrifice to the public interest." Id. at 579, 93 S.Ct. at 2897. The Court concluded: "Surely there seemed to be little question in the minds of the plaintiffs who brought this lawsuit as to the meaning of the law, or as to whether or not the conduct in which they desire to engage was or was not prohibited by the Act." Id.
 
 
 30
 The Court found that the Oklahoma equivalent of the federal Hatch Act was not unconstitutionally vague in Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The statute at issue there prohibited state employees from engaging in a wide range of partisan political activities. Relying on its holding in Civil Service Commission v. Letter Carriers, supra, the Court found that "it is all but frivolous to suggest that the (statute) fails to give adequate warning of what activities it proscribes or fails to set out 'implicit standards' for those who must apply it." 413 U.S. at 607, 93 S.Ct. at 2913. Furthermore, the Court observed that "even if the outermost boundaries of (the statute) may be imprecise, any such uncertainty has little relevance here, where appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions and appellants concede as much." Id. at 608, 93 S.Ct. at 2914.
 
 
 31
 Herzbrun v. Milwaukee County, 504 F.2d 1189 (7th Cir. 1974), is a similar case. There, employees of a county welfare department were discharged under the provision of a county civil service rule for having deliberately disrupted the phone system at the welfare department. The employees challenged the regulation under which they were terminated as unconstitutionally vague. The challenged regulation stated that cause for discharge was provided by one
 
 
 32
 guilty of acts . . . unbecoming an incumbent of the particular office or position held, which render his suspension, demotion, or discharge necessary or desirable for the economical or efficient conduct of the business of the county or for the best interest of the city government.
 
 
 33
 The Seventh Circuit had no difficulty in finding that
 
 
 34
 an employee's deliberate promotion of and participation in a massive and prolonged disruption of the telephone communication system of a very large departmental office is "hard core" conduct which any reasonable person must know would be cause for discipline or dismissal from employment whether described in a rule or not.
 
 
 35
 Id. at 1193. Accordingly, the court held that the plaintiff did not have standing to challenge the rule for vagueness.
 
 
 36
 Although not proscribed in specific terms by the Fire Bureau Rules, we agree with the district court that Aiello's conduct on the evening of January 30, 1973, was also hardcore conduct plainly within the scope of those rules.[11] Aiello's argument that his entry into the record store was unintentional and therefore not "hard core" is without merit. Any reasonable person should have known that breaking and entering into a private establishment was within the reach of the regulations. Even though his drunken state may have affected the mens rea necessary to classify his conduct as criminal,[12] it does not deprive the City of the right to levy sanctions against employees who engage in such conduct.[13]
 
 
 37
 We therefore sustain the district court's holding that Aiello's conduct on the evening of January 30, 1973, was within the scope of the Bureau of Fire regulations and, thus, those rules were not vague as applied to him.
 
 III.
 
 38
 Aiello also contends that Rules 169.16 and 169.23 are unconstitutionally overbroad. Although challenges for vagueness may not be asserted vicariously, the Supreme Court has "consistently allowed attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965). See Thornhill v. Alabama, 310 U.S. 88, 97-98, 60 S.Ct. 736, 741-742, 84 L.Ed. 1093 (1940). The rationale permitting such a liberalized rule for standing in the first amendment overbreadth context is the very real concern that, in a democratic society, "the possible harm . . . in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes." Broadrick v. Oklahoma, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). Litigants, therefore, may "challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Id.
 
 
 39
 Because invalidation for facial overbreadth is "strong medicine," there are nonetheless limits to its application.[14] The standards for the use of the facial overbreadth doctrine were set forth by the Supreme Court in Broadrick v. Oklahoma, supra. There, three employees of the State of Oklahoma were charged with violations of a state law which, like the federal Hatch Act, restricted the political activities of state employees. Although conceding that the statute was constitutional as applied to their own conduct, the employees nevertheless argued that the statute reached protected as well as unprotected conduct and therefore must be struck down as unconstitutionally overbroad. The Court, however, rejected the overbreadth argument. The Court reasoned that the function of facial overbreadth adjudication
 
 
 40
 attenuates as the otherwise unprotected behavior it forbids the State to sanction moves from "pure speech" toward conduct and that conduct even if expressive falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.
 
 
 41
 Broadrick v. Oklahoma, supra, 413 U.S. at 615, 93 S.Ct. at 2917. Thus, the Court concluded that "where conduct and not merely speech is involved," the overbreadth of a statute must not only be real but also substantial, viewed in light of the statute's plainly legitimate sweep. Id.
 
 
 42
 Applying the substantial overbreadth test to the statute at issue in Broadrick, the Court concluded that the challenged section of the Oklahoma statute need not be discarded in toto "because some persons' arguably protected conduct may or may not be caught or chilled by the statute."[15] Id. at 618, 93 S.Ct. at 2919. In reaching this conclusion the Court noted that the statute sought "to regulate political activity in an even-handed neutral manner," that it had been narrowed by administrative interpretation, and that the employees' conduct was clearly within its permissible scope. Id. at 616-18, 93 S.Ct. at 2918.
 
 
 43
 It is not clear whether Broadrick is appropriately viewed as addressing only the issue of standing or whether the Court there also reached the merits of the overbreadth argument. See Turchick v. United States, 561 F.2d 719, 721 (8th Cir. 1977). The distinction, however, may have little significance. See Note, First Amendment Vagueness and Overbreadth: Theoretical Revisions by the Burger Court, 31 Vand.L.Rev. 609, 613 (1975). In any case it is apparent that, where Broadrick is applicable, a statute or rule must be substantially overbroad before it may be invalidated merely for facial overbreadth.
 
 
 44
 In this case the district court found "little doubt that . . . Rules 169.16 and 169.23 legitimately apply to a substantial amount of conduct or number of activities which properly may be proscribed, and the overbreadth, if any, of the rules is marginal." Aiello v. City of Wilmington, supra, 426 F.Supp. at 1294. Aiello, however, asserts that it is clear that Rules 169.16 and 169.23 prohibit protected speech or association and therefore their overbreadth cannot be dismissed as "marginal." But we have already determined that Aiello's conduct on the night of January 30, 1973, was "hardcore conduct" within the permissible sweep of the Bureau of Fire rules. The activity for which he was charged was conduct and not speech.[16] Further, the rules under which he was disciplined are not directed solely at "pure speech" but are aimed at a range of conduct and speech.[17] Accordingly we must proceed under the Broadrick rule to determine if the overbreadth, if any, of the Bureau of Fire rules is substantial. Some guidance for the interpretation of Rules 169.16 and 169.23 can be found, according to testimony of former Fire Chief Malloy, in Rule 170. Chief Blackburn, currently head of the Bureau of Fire, concurred, stating that Rule 170 is a guideline for determining what is conduct unbecoming a fireman and a gentleman. Aiello claims, however, that many of the provisions of Rule 170 prohibit protected conduct or association and thus that rules 169.16 and 169.23 are substantially overbroad.[18]
 
 
 45
 Although the Supreme Court has not addressed precisely the factors relevant to a determination whether a statute is substantially overbroad, an examination of Broadrick itself, and the decisions of other courts applying the "substantial overbreadth" test, offers some guidelines. In Broadrick the Court concluded that the state statute at issue had been interpreted to restrict the wearing of political buttons or the use of bumper stickers, which would seem to be clearly within the protected scope of the first amendment. Nonetheless, the Court found the challenged statute not to be substantially overbroad. The Court's opinion was apparently based in large part upon its belief that the intrusions upon protected conduct sanctioned by the statute were marginal compared with its primary thrust aimed at clearly regulable conduct. See The Supreme Court, 1972 Term, 87 Harv.L.Rev. 1, 151 (1973). "The first guideline which should control overbreadth scrutiny is the most obvious: a law ought not to be struck down for overbreadth unless it lends itself to a substantial number of applications." Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 858-59 (1970). Judge Coffin applied this principle in Magill v. Lynch, 560 F.2d 22, 30 (1st Cir. 1977), cert. denied, 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978), measuring substantiality of the overbreadth by "the number of valid applications compared to the number of potentially invalid applications." See Turchick v. United States, 561 F.2d 719, 725 (8th Cir. 1977). At the same time Judge Coffin cautioned that
 
 
 46
 (s)ome sensitivity to reality is needed; an invalid application that is far-fetched does not deserve as much weight as one that is probable. The question is a matter of degree; it will never be possible to say that a ratio of one invalid to nine valid applications makes a law substantially overbroad. . . .
 
 
 47
 Magill v. Lynch, supra, 560 F.2d at 30.
 
 
 48
 Merely balancing the number of permissible applications obviously is not sufficient. Even one unconstitutional application may affect many individuals and therefore may be said to be "substantial." See The Supreme Court, 1972 Term, supra, 87 Harv.L.Rev. 151. Thus, the historic or likely frequency of a statute's conceivably impermissible applications is also relevant. If that frequency is relatively low, it may be more appropriate to guard against the statute's conceivably impermissible applications through case-by-case adjudication rather than through facial invalidation.
 
 
 49
 Further, the substantiality of a statute's overbreadth may be determined by the nature of the activity or conduct sought to be regulated. A statutory scheme which encompasses the kind of expressive and associational activity that has been traditionally held to be entitled to a high degree of first amendment protection should be subjected to closer judicial scrutiny than one which does not. See Note, The First Amendment Overbreadth Doctrine, supra, 80 Harv.L.Rev. at 860.
 
 
 50
 Finally, the nature of the state interest underlying the statute or regulation is also relevant. Facial invalidation necessarily encroaches upon legislative prerogatives. Those sections of a statute covering conduct which is permissibly regulable are swept aside for fear of the chilling effect emanating from its impermissibly broad language. This may not be an undesirable result, for the first amendment is nonmajoritarian in nature and must in the last resort depend upon the courts for enforcement. Yet facial invalidation is not a finely honed scalpel in the hands of a judicial surgeon but a broad-blade instrument, which must be applied with restraint. "(F)acial overbreadth adjudication is an exception to our traditional rules of practice and . . . its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct . . . ." Broadrick v. Oklahoma, supra, 413 U.S. at 615, 93 S.Ct. at 2917.
 
 
 51
 Having articulated the factors relevant to a determination of "substantial overbreadth," we now turn to Gasparinetti v. Kerr, supra, 568 F.2d at 315, relied on by Aiello, where we observed:
 
 
 52
 When faced with an overbreadth challenge a court must decide, first if there is a legitimate and substantial state interest in regulating a class of speech, and, if so, whether that interest is being "pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."
 
 
 53
 Although public employees, like all citizens, have first amendment rights, "(t)he area of unregulable speech available to public employees is . . . narrower than that available to the public at large." Id.[19]
 
 
 54
 Accordingly, in certain instances, the discharge of public employees on the basis of speech has been held not to violate first amendment guarantees. Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 633, 40 L.Ed.2d 15 (1974). Rules restricting or forbidding political activity of public employees have been upheld against first amendment challenges. See Broadrick v. Oklahoma, supra; Civil Service Commission v. Letter Carriers, supra. And in a professional fire department, the area of unregulable speech may be somewhat less available than for public employees generally. There, particular concerns of efficiency, discipline, and public trust are present. Firemen, for instance, frequently go into homes and other establishments while the occupants are not present. Wilmington's interest in the challenged regulations, thus, appears substantial.
 
 
 55
 As can be observed from the provisions of Rule 170, the thrust of Rules 169.16 and 169.23 is substantially aimed at conduct and speech of firemen which could reasonably be expected to have a deleterious effect upon the City's legitimate concerns for efficiency, discipline and morale within the Fire Bureau, as well as public trust in the Fire Bureau's integrity. Rule 170 prohibits, inter alia : neglecting to assist a fellow fireman in the performance of a duty, accepting or soliciting bribes, rewards, or favors, and making a false official report. Furthermore, the prohibitions against releasing departmental information without authorization and prohibiting firemen from engaging in partisan political activity also seem to reflect legitimate concerns for the properly regulable activities of such public employees.[20]
 
 
 56
 Although a few of the interpretive guidelines of Rule 170 suggest that Rules 169.16 and 169.23 may have arguably overbroad applications, the number of clearly valid applications of Rule 169.16 and 169.23, reflected in the guidelines far outweighs the conceivably impermissible applications. Thus, the facial overbreadth of these rules, if any, fades significantly when compared with their otherwise legitimate sweep.[21] We therefore hold the Rules are not substantially overbroad and we perceive no error in the district court's holding that Aiello lacked standing to challenge the Bureau of Fire rules for unconstitutional overbreadth as to the events of January 30, 1973.[22]
 
 IV.
 
 57
 Aiello brings a separate overbreadth challenge to Rules 169.16 and 169.23 for the period of his probation. In addition, he asserts that Rules 170.7 and 170.8 are overbroad. Rules 170.7 and 170.8 proscribe under penalty:
 
 
 58
 170.7. Gossiping about a member of the Department of Public Safety concerning either his personal character or conduct to the detriment of the member.
 
 
 59
 170.8. Criticizing the official action of a superior officer.
 
 
 60
 Because Aiello was not actually charged with a violation of these rules during his probationary period, despite his admitted activities within the scope of the alleged chilling effect, the district court chose to treat his attack on the rules as one of unconstitutional chill. Accordingly, the district court dismissed this challenge in the following words:
 
 
 61
 The description of a pall cast over his life by operation of the regulations is just not consonant with his own deposition testimony concerning his activities during the probationary period. For example, his once monthly night of drinking while on probation the very activity which by his own admission had precipitated his prior difficulties saps the force of his "chill" complaint. Moreover, despite his broad assertion of a fear to appeal his Trial Board sentence, Aiello admits sending a letter to Chief Blackburn several months after the Trial Board hearing requesting payment for the time during which he was suspended. In addition, it is clear that he did not hesitate in attempting to enlist the firefighter's union's assistance in his behalf.
 
 
 62
 426 F.Supp. at 1294 (footnotes omitted).
 
 
 63
 We have already held that Aiello lacks standing to challenge the overbreadth of Rules 169.16 and 169.23 as to the events of January 30, 1973. For the period during which he was on probation, however, Aiello asserts that he was deterred from engaging in otherwise protected activity by the threat that if he violated these rules he would be subject to dismissal. Aiello alleges a chilling effect not only upon his conduct but upon his speech as well. For instance, he argues that, because of the threat of dismissal, he was afraid to complain to the Fire Bureau during this period. In contrast to his allegation about the Record Museum incident, an incident which cannot be characterized as speech, Aiello alleges an impermissible restriction of his speech during the probationary period. The Broadrick "substantial overbreadth" requirement is therefore inapplicable because it is restricted to conduct.
 
 
 64
 Nevertheless, the general standing requirements of article III must still be met. "The very essence of a chilling effect is an act of deterrence." Shauer, Fear, Risk and the First Amendment: Unraveling the "Chilling Effect", 58 B.U.L.Rev. 685 (1978). An impermissible chill is created when one is deterred from engaging in protected activity by the existence of a governmental regulation or the threat of prosecution thereunder. But generalized allegations of chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm. Laird v. Tatum, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 2325-2326, 33 L.Ed.2d 154 (1972). Thus, when a plaintiff is not the subject of an enforcement action under an allegedly overbroad statute, there must be some likelihood that he has been or will be deterred from engaging in constitutionally protected activity by the operation of the regulations.[23]
 
 
 65
 Aiello complains that, after his Trial Board hearing, he felt like he was living under a cloud and had to watch his step. These constraints, he alleges, required that he refrain from engaging in adultery, listening to loud music, and in controversies and "kitchen talk," i. e., use of vulgar language.[24] Aiello also claims that his fear of the rules made him reluctant to appeal the decision of the Trial Board or to complain about his treatment.
 
 
 66
 Aiello's probationary period is over and he has since retired from the Fire Bureau. Thus, Aiello is no longer subject to the proscriptive effect of the regulations. Rather, his claim of an unconstitutional chilling effect rests upon a discrete period in the past. It is reasonable, therefore, to look to the record to determine whether his conduct during that period is consistent with his claims.
 
 
 67
 In the case before us we are faced not with a silent record but with a record of conduct, admitted by Aiello, which directly contradicts his charges of a chilling effect. The record indicates that he corresponded directly with Chief Blackburn and requested that he be compensated for the period of his suspension. Aiello also requested compensation for "the time he spent in reporting in." In addition, he conceded during his depositions that he became drunk a number of times during the period following his Trial Board hearing. The record also indicates that Aiello complained to and sought advice from his union during the probationary period. Finally, no disciplinary action was taken against Aiello for having engaged in those activities.
 
 
 68
 Although Aiello might have chosen to submit other evidentiary material indicating the existence of a genuine issue of material fact, he did not.[25] His own recital in the deposition of his activities during the probationary period is undisputed and directly undermines the allegations in his pleadings of a chilling effect.[26] Thus, we agree with the district court that there was no genuine issue of material fact and that the defendants were entitled to prevail as a matter of law.
 
 V.
 
 69
 Aiello's final contention concerns the conduct of his trial in the district court. He asserts that the court erred in refusing to permit him to confer with his counsel during breaks in Aiello's cross-examination. The district court directed Aiello's counsel not to communicate with him during breaks in Aiello's cross-examination for lunch and overnight.
 
 
 70
 Aiello urges that we extend the rule set forth in Geders v. United States, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), to civil cases. In Geders, the trial judge ordered the defendant in a federal criminal prosecution not to consult with his attorney "about anything" during a seventeen hour overnight recess in the trial between his direct and cross-examination. There, as here, the district court was concerned about the possible "coaching" of the defendants. The Supreme Court, however, held that the district court's order impinged upon the defendant's sixth amendment right to the assistance of counsel.
 
 
 71
 Some years before the Geders decision we had occasion to consider a similar situation in United States v. Venuto, 182 F.2d 519 (3d Cir. 1950). In Venuto, the district court forbade conversation between the defendant and his counsel during an 18-hour, overnight recess in the defendant's cross-examination. We rejected the Government's assertion that the defendant should be required to make a specific showing of prejudice and held that the district court's ruling was "most certainly (a) deprivation of the defendant's constitutional right to consult counsel at all stages of the proceeding."[27] Id. at 522. We have not had occasion, however, to consider the effect of such a rule in the context of civil litigation.
 
 
 72
 The extension of the Geders rule to civil cases is an interesting but troublesome question that has been addressed only infrequently by the courts and not at all by commentators.[28] We need not decide the issue on this record however. The thrust of Aiello's complaint is that, because of the district court's ruling, he was prevented from consulting with his counsel concerning the examination of two expert witnesses who testified during breaks in Aiello's cross-examination. Except for those witnesses, we are not directed to any other particular matter pertaining to trial strategy as to which consultation would have been helpful. As for the expert witnesses, it is not clear on this record that Aiello was in fact deprived of his right to confer with counsel concerning the testimony.
 
 
 73
 During the relatively brief period Aiello was under cross-examination, from the morning of May 4, 1978, until the afternoon of the next day, his testimony was twice interrupted for the introduction of expert testimony in his behalf. Although Aiello's counsel now claims that the court's earlier ruling precluded consultation concerning the expert's testimony, we do not view the restriction as having that purpose or effect. The district court made it clear that it was concerned only that "the witness should not be coached during cross-examination." If counsel were concerned that consultation as to the expert witnesses was barred, they might have requested clarification or an opportunity to confer on matters pertaining to the experts. Moreover, the experts were Aiello's witnesses, and if he felt hampered by the court's direction, they could have been called following the conclusion of Aiello's cross-examination. Finally, we note that, upon the termination of the cross-examination, the district court granted Aiello permission to consult with his counsel during a ten minute break prior to redirect examination. Counsel, however, chose not to exercise that authority. On this record, therefore, we cannot conclude that the district court committed reversible error.
 
 VI.
 
 74
 In summary, we conclude that Aiello, as the perpetrator of "hard core" conduct, is within the scope of the Bureau of Fire rules and, thus, those regulations are not vague as applied to him. Those rules are not substantially overbroad and Aiello therefore lacks standing to challenge them for unconstitutional overbreadth as to the period from January 30, 1973, to May 9, 1973. Aiello's allegations of chill in his probationary period, involving a discrete period in the past, are contradicted by the record, and thus he also lacks standing to challenge the rules for unconstitutional overbreadth for that later period. Finally, Aiello has failed to demonstrate reversible error as a result of the district court's refusal to allow him to consult with his attorney while on cross-examination.
 
 
 75
 Accordingly, the judgment of the district court will be affirmed. Each side to bear its own costs.
 
 
 76
 SLOVITER, Circuit Judge, Concurring and Dissenting.
 
 
 77
 Although the facts in this case do not present a sympathetic basis on which to analyze First Amendment principles, it is an inevitable fact that they seldom do. See, e. g., Collin v. Smith, 578 F.2d 1197 (7th Cir.), cert. denied, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978). Those persons who voice acceptable viewpoints or who are able to articulate their goals and interests in terms which are either shared or accepted as legitimate by those who shape official policy are seldom in need of the Amendment's support. It is when we must face the unpopular or distasteful expression that the concept of free speech needs its most vigilant protection. See, e. g., Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1359 (1931).I.
 
 
 78
 The overbreadth doctrine represents a judicial recognition that overbroad laws which may deter constitutionally protected expression by those not before the court must be capable of challenge by others in order to avoid the possibility that the unconstitutional effect of such laws will escape judicial review. The recent limitation of the doctrine to those statutes or rules which are "substantially overbroad", Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), forces us to consider how such substantiality can be determined. I cannot quarrel with the majority's identification of the four relevant factors: the number of valid applications, the historic or likely frequency of conceivably impermissible applications, the nature of the activity or conduct sought to be regulated, and the nature of the state interest underlying the regulation. If the majority's analysis of the last factor had been limited to the state interest in regulating the conduct of city firemen, which was the only application made as to Aiello in the disciplinary context, there would be no need to write separately on this issue.
 
 
 79
 Unfortunately, in its analysis of the state interest factor, the majority has digressed on an issue not presented by the facts, i. e. "the discharge of public employees on the basis of speech", and has reiterated the dictum in Gasparinetti v. Kerr that public employees enjoy narrower First Amendment rights than the public at large. Since the majority has inserted this issue into its analysis, some comment on the cases cited is necessary in order to forestall us from falling into the unjustifiable pattern whereby dictum, simply because it has been repeated frequently, is given the force of precedent.
 
 
 80
 The Supreme Court has consistently upheld the principle that public employees are entitled to full protection of their rights under the First Amendment. In Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), the Court stated, "To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court." This holding was reinforced last term when the Court held "This Court's decisions in Pickering, Perry, and Mt. Healthy do not support the conclusion that a public employee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly." Givhan v. Western Line Consolidated School District, 439 U.S. 410, 414, 99 S.Ct. 693, 695, 58 L.Ed.2d 619 (1979).
 
 
 81
 The cases cited by the majority in which action was taken against public employees on the basis of speech represent very limited incursions into this normally protected area which were sanctioned only because of overriding and weighty countervailing policies. In Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), defamatory statements made by an OEO employee about his superiors "without any proof whatsoever and in reckless disregard of the actual facts", id. at 137, 94 S.Ct. at 1636, were held to constitute cause for dismissal under the Lloyd-La Follette Act, which was construed as being directed at employee behavior, including speech, detrimental to the efficiency of the employing agency. In CSC v. Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), the Hatch Act prohibition against partisan political activities by federal employees was sustained as necessary to efficient and fair Government operation. The Court noted that the Act specifically provides that the employee retains the right "to express his opinion on political subjects and candidates." Id. at 576, 93 S.Ct. at 2895.
 
 
 82
 The majority cites no Supreme Court case to support its statement that "in a professional fire department, the area of unregulable speech may be somewhat less available than for public employees generally" because of the presence of "particular concerns of efficiency, discipline and public trust." At p. 855. In fact, this court's opinion in Gasparinetti v. Kerr, 568 F.2d 311 (3d Cir. 1977), cert. denied, 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978), rejected the view of the dissenting judge there that "the need for police discipline and espirit de corps (sic)" could be seen as an excuse for abridging First Amendment rights. Id. at 322. Instead, the majority of the panel in Gasparinetti referred to the Supreme Court's statement in Garrity v. New Jersey, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967), that "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights" (cited at 568 F.2d at 316).
 
 
 83
 The dissent in Gasparinetti relied on Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), where the conviction of an army physician by general court-martial for, inter alia, urging enlisted men to disobey orders to go to Vietnam was upheld in a majority opinion replete with references to the distinction between military and civilian society. For example, the Court stated "the military is, by necessity, a specialized society separate from civilian society," id. at 743, 94 S.Ct. at 2555; "the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty," id. at 744, 94 S.Ct. at 2556 (quoting Burns v. Wilson, 346 U.S. 137, 140, 73 S.Ct. 1045, 1047-1048, 97 L.Ed. 1508 (1953) (plurality opinion)); and most significantly, "In civilian life there is no legal sanction civil or criminal for failure to behave as an officer and a gentleman; in the military world, Art. 133 imposes such a sanction on a commissioned officer," id. at 749, 94 S.Ct. at 2558. However, any implication that the restriction on speech sustained as to military personnel can be extended to civilians because they work in a department, such as a fire department, which requires discipline and a uniform while on duty would portend a dangerous inroad on one of our most cherished freedoms.
 
 
 84
 The majority's holding that the regulation is not overbroad can be supported on a much more limited basis. Here, as in Broadrick, appellant has been charged with conduct, not speech, under a regulation which is not directly related to speech, and the state interest in regulation of the conduct of its firemen, particularly the conduct in question, is apparent. Therefore the regulation, like the statute in Broadrick, cannot confidently be invalidated on the ground that it may deter speech to some unknown extent since appellant has failed to produce any evidence that the regulation has, in fact, been applied to trench upon speech.
 
 II.
 
 85
 Aiello also claimed that he was unconstitutionally chilled from protected speech during the period of his probationary period which lasted more than two years. The trial court prevented the jury from making any determination on this claim. Instead, it granted summary judgment for the City on this claim on the basis of the following analysis:
 
 
 86
 In order to prevail on a claim of "chill" concerning protected First Amendment activities and speech, a party must first establish that it has suffered actual injury or harm. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Laird v. Tatum, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154 (1972); accord Paton v. LaPrade, 524 F.2d 862, 873-74 (3d Cir. 1975); cf. O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Given this requirement, Aiello's vague allegations of subjective chill, perhaps questionable on their face, and further undermined by his testimony which documented the absence of a specific inhibiting effect exerted by the Rules on his activities, are insufficient to sustain a claim of unconstitutional chill. Accordingly, defendants' motion for summary judgment on this issue is granted.
 
 
 87
 426 F.Supp. 1272, 1294-95 (D.Del.1976) (footnotes omitted).
 
 
 88
 The trial court misconstrued the purport of the Court's decision in Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). In Laird, plaintiffs brought a class action seeking declaratory and injunctive relief alleging that their rights were being invaded by the Department of the Army's alleged "surveillance of lawful and peaceful civilian political activity." Id. at 2, 92 S.Ct. at 2320. The appellants were private citizens and organizations who, their lawyer admitted, were not "cowed and chilled", see 444 F.2d 947, 959 (D.C.Cir.1971) (concurring and dissenting opinion), but sought to represent a class of millions of Americans who were not as "courageous." It was under those circumstances that the Supreme Court held plaintiffs lacked standing because there was no justiciable controversy on the basis of the record in that case. It was in that context that the Court made the statement misapplied by the trial court:
 
 
 89
 Allegations of a subjective "chill" are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; "the federal courts established pursuant to Article III of the Constitution do not render advisory opinions." United Public Workers v. Mitchell, 330 U.S. 75, 89, (67 S.Ct. 556, 564, 91 L.Ed. 754) (1947).
 
 
 90
 408 U.S. at 13-14, 92 S.Ct. at 2325. The Court did not state nor suggest that an individual who claims an actual chill based on the reasonable possibility that a regulation will be applied directly to that individual lacks standing. Quite the contrary! The Court distinguished the situation it was faced with in Laird from those cases in which "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging," id. at 11, 92 S.Ct. at 2324, citing as examples of that line of cases, Baird v. State Bar of Arizona, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).
 
 
 91
 It is impossible in this case to ignore the fact that Aiello was "presently or prospectively subject to" Rules 169.16 and 169.23 because an explicit condition of his probation was that "If in the event Fireman Aiello appears in violation of either of the two charges which he was adjudged guilty by the Trial Board . . . during this stipulated probationary period, the Trial Board orders that Fireman Aiello be dismissed." The two charges were violation of Rules 169.16 and 162.23, which proscribe "conduct unbecoming a fireman and a gentleman whether on or off duty" and require firemen to "be governed by the customary rules of good behavior observed by law-abiding and self-respecting citizens." The Fire Chief at the time of Aiello's arrest, his successor, and a member of the Trial Board all testified that Rule 170, which contained 54 subparts applicable to both speech and conduct, provided guidance for the interpretation of Rule 169.16. Aiello challenged particularly Rule 170.7 proscribing "gossiping about a member of the Department of Public Safety concerning either his personal character or conduct to the detriment of the member", and Rule 170.8 proscribing "criticizing the official action of a superior officer." The latter was almost identical to the regulation invalidated as overbroad in Gasparinetti v. Kerr, but the trial court denied Aiello's motion for reconsideration based on that decision.
 
 
 92
 In its reliance on Laird, it is evident that the trial court confused Aiello's standing with the merits of his claim. Aiello testified as to the direct effect on him of the terms of the probation, which was certainly sufficient to satisfy standing. He testified that he felt as though he "had to sit in the house and be handcuffed to a chair and not say a word" while on probation. Because of the threat of automatic dismissal, he said he "felt as if there was a cloud hanging over my head."
 
 
 93
 It is unclear on what legal basis the majority affirms the trial court's grant of summary judgment against the plaintiff on this claim. The majority states that it agrees with the district court that there was no genuine issue of material fact, but ignores the fact that the district court applied an incorrect legal standard to the crucial issue of identification of the relevant issue of material fact. It is not clear whether the majority, by its failure to comment on this issue, is sub silentio accepting or rejecting the district court's holding that Aiello had no standing because his claim of chill was too "subjective." It would appear that what the majority is doing is evaluating the evidence to determine the credibility of Aiello's claim that he was, in fact, chilled. This is precisely the inquiry which a court should not make on a motion for summary judgment.
 
 
 94
 The trial court and the majority hone in on Aiello's inability to articulate with more specificity the chill effect, and apparently consider as trivial his alleged constraint regarding the use of "kitchen talk", i. e. use of vulgar language. It is, of course, true that had Aiello been more effectively prepared for this question at his deposition, he might have been able to describe in more appealing terms the constraints which he felt. But even "opprobrious words or abusive language" are subject to First Amendment protection, Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), as is the use of "obscene or opprobrious language," Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974). See also Rosenfeld v. New Jersey, 408 U.S. 901, 92 S.Ct. 2479, 33 L.Ed.2d 331 (1972); Lewis v. City of New Orleans, 408 U.S. 913, 92 S.Ct. 2499, 33 L.Ed.2d 321 (1972). Federal judges may have more fastidious tastes than the ordinary citizen, but Aiello's First Amendment rights to use the language he chooses cannot be summarily rejected because his inclination runs towards his own use of such language rather than reading it in the works of, for example, Henry Miller. See, e. g., Attorney General v. Book Named "Tropic of Cancer," 345 Mass. 11, 184 N.E.2d 328 (1962).
 
 
 95
 In any event, Aiello also claimed that he was inhibited from complaining about his treatment and from appealing the decision of the Trial Board. The fact that he did complain to his union and wrote to the fire chief requesting that he be compensated for reporting time does not mean a jury would not have been able to find that he would have complained more vigorously about his treatment. Considering the discipline imposed, 2000 hours of work without compensation, one might reasonably have expected some more vigorous complaint than that in which he engaged.
 
 
 96
 Under the interpretation of Rule 56 consistently applied by this court, summary judgment could not be granted unless there was no issue of material fact. In the eight months since I have joined this court, there have been numerous decisions reversing the grant of summary judgment by district judges because there was an issue of material fact which precluded resort to Rule 56 to short circuit one of the party's right to a trial.[1] These cases covered the gamut of issues which appear before us, from prisoners' rights to patent fraud. It is unfortunate that we divert from this tradition in a case where the underlying claim is based on the right which many believe ranks among the most fundamental of those protected by our Constitution.
 
 
 97
 "In deciding a motion for summary judgment, every reasonable inference must be given to the party opposing the motion, here (Aiello)." See Sanford v. O'Neill, 616 F.2d 92, 96 (3d Cir. 1980); Drexel v. Union Prescription Centers, Inc., 582 F.2d 781, 789 (3d Cir. 1978). The trial court, substituting his own judgment for that of the jury, decided that the chilling effect was not real but only "subjective." That, in itself, is a patent contradiction in terms because the "real" and the "subjective" are not mutually exclusive. Chill to an individual can only be subjective. In effect, the trial judge decided that he did not believe Aiello. The majority has engage in a similar weighing of the evidence. Although it purports to decide that Aiello's own testimony "undermines the allegation in his pleadings of a chilling" effect, it ignores Aiello's own testimony of such an effect, apparently because it, like the trial court, does not believe Aiello. It may be likely that under the circumstances of this case a jury would have decided the same. But Aiello was entitled to the opportunity to present to a jury his evidence of chill. Men and women who do not have the lifetime tenure of federal judges to protect their expressions might have felt more empathy with the situation of an individual who claimed a generalized inhibition regarding his language and his expressions because he feared dismissal pursuant to the indefinite rules which were being applied to him. I believe our Constitution gives Aiello the opportunity to present this claim to his peers. I would therefore reverse the grant of summary judgment on this ground.
 
 
 
 [1]
 Aiello asserts that he does not remember how he got into the store
 
 
 [2]
 The State's decision not to prosecute apparently rested in part on the medical report of Dr. George E. Voegele. Dr. Voegele stated in part that:
 In this frame of mind (Aiello) became indeed emotionally disturbed, his own repressed hostile feelings increased this emotional disturbance and he developed neurotic symptoms with paranoid elaboration of the actual persecution by his brother John. The alcohol (on January 30, 1973) released his hostile feelings and he had an acute disassociative reaction with paranoid symptoms when the window smashing happened. This is like an irresistible impulse and at this time I believe he would have done the same, even if the police would have been present. I am convinced stealing was not his motive, but to release his penned up hostility. I do think he needs help and treatment rather than punishment.
 
 
 [3]
 Aiello also alleges that outside employment was barred while on suspension. The defendants, however, deny that they refused to give Aiello permission to seek outside employment
 
 
 [4]
 The district court denied Aiello's motion for class certification, finding that the requirements of Fed.R.Civ.P. 23 had not been met and because the case was not appropriate for certification as a class action. Aiello does not appeal from this ruling and thus it is not at issue here
 
 
 [5]
 Aiello also alleged that the suspension procedure used by the Bureau of Fire denied him his procedural due process rights; that the Trial Board was not impartial; and that the City breached its contract with the firefighters' union and violated 19 Del.Code § 902 by not paying Aiello for work he had been required to perform
 
 
 [6]
 The court denied the defendants' motion for summary judgment with respect to Aiello's claim that he had been deprived of his procedural and substantive due process rights and as to the defendants' claim that they were entitled to official immunity and were not liable to Aiello for punitive damages
 
 
 [7]
 Aiello also sought reconsideration of the court's refusal to exercise pendent jurisdiction over certain state claims advanced in his amended complaint
 
 
 [8]
 Because Aiello seeks compensatory damages as well as injunctive relief, his retirement from the Fire Bureau does not moot this action
 
 
 [9]
 Aiello does not deny that he committed the entry in question but asserts that he did not do so consciously or intentionally
 
 
 [10]
 Nonetheless, there are limitations on the rights of litigants to raise third party rights in challenging statutes for facial overbreadth. See section III, infra
 
 
 [11]
 Bence v. Breier, 501 F.2d 1185 (7th Cir. 1975), cited by the plaintiff, is distinguishable. There, the Seventh Circuit considered a regulation similar in character to those at issue here. A police officer was charged with "conduct unbecoming a member and detrimental to the service" in violation of the rules of the Milwaukee Police Department. The act which triggered the charge was the sending of a letter critical of departmental policy. The act was plainly activity protected by the first amendment, and not "hardcore conduct" as is the case here
 
 
 [12]
 See note 2 supra
 
 
 [13]
 Further, we note that Rule 170.46 proscribes "intoxication while on or off duty." Former Fire Chief Malloy stated that Rule 170 provides guidance for the interpretation of Rules 169.16 and 169.23. Thus, even without considering the Record Museum incident, Aiello would still have been properly subject to disciplinary action because of his publicly intoxicated state. There is no assertion that his intoxication was other than voluntarily self-induced. One who becomes voluntarily intoxicated is generally held to the same standard of care as one who is sober. See Hadley v. Baltimore & O. R. Co., 120 F.2d 993, 995 (3d Cir. 1941)
 
 
 [14]
 It has been observed that "the presumption must be that only substantially overbroad laws set up the kind and degree of chill that is judicially cognizable." Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 859 (1970) (footnote omitted) (emphasis added)
 
 
 [15]
 Section 818 of Oklahoma's Merit System of Personnel Administration Act challenged in Broadrick, supra, serves roughly the same function as the analogous provisions of the other 49 states and is patterned on section 9(a) of the Hatch Act. The Court acknowledged that a broad range of political activities and conduct is proscribed by the act. For the precise language of the section, see 413 U.S. at 603 n.1, 93 S.Ct. at 2911
 
 
 [16]
 This case is thus distinguishable from Davis v. Williams, 598 F.2d 916 (5th Cir. 1979). There a fireman publicly criticized the fire chief and, as a result, was indefinitely suspended under the provision of a Fire Department rule forbidding "conduct prejudicial to good order." The Fifth Circuit affirmed the district court's holding that the rule was both facially overbroad and vague. The court found that "the municipal code has, on its face, at least some application to conduct that would be considered 'speech' under the first amendment. That impact cannot be dismissed as tangential or even minimal." Id. at 920. In Davis, however, the activity for which the fireman was punished was speech. Therefore, unlike the instant case, the plaintiff had standing to challenge the rule for overbreadth
 
 
 [17]
 The distinction between speech and conduct is difficult to draw, see Magill v. Lynch, 560 F.2d 22, 30 (1st Cir. 1977), cert. denied, 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978), and has been questioned by both courts and commentators. See, e. g., Davis v. Williams, supra, 598 F.2d at 919 n.5 ("The trouble with the distinction between speech and conduct is that it has no real content.") (quoting from L. Tribe American Constitutional Law 599 (1978)); Henkin, Forward: On Drawing Lines, 82 Harv.L.Rev. 63, 79 (1968) ("A constitutional distinction between speech and nonspeech has no content."). Others have suggested that, under the Broadrick "substantial overbreadth" rule, conduct which verges on "pure speech" should trigger a higher level of scrutiny than mere conduct. See, e. g., Paulos v. Breier, 507 F.2d 1383, 1386 n.6 (7th Cir. 1974). See also Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing armband as protest against the Vietnam war was symbolic act closely akin to "pure speech"); West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed.2d 1628 (1943) (saluting flag is symbolic speech). In the instant case, however, Aiello's activities on the evening of January 30, 1973, cannot be said to bear any resemblance to pure speech or even conduct expressing a view on a public issue
 Aiello suggests, however, that his statement at the time of his arrest that he was a fireman constituted speech and thus, that he is not within the scope of the Broadrick rule. There is no indication, however, that the disciplinary proceedings initiated against him were in any way an attempt to punish him for uttering this statement. Rather, the record reveals that the event that triggered the proceedings was Aiello's unlawful episode at the Record Museum.
 
 
 [18]
 Aiello suggests that a number of the provisions of Rule 170 encroach upon protected speech or association. His argument and briefs, however, focus principally on the following:
 
 
 [170]
 7 Gossiping about a member of the Department of Public Safety concerning either his personal character or conduct to the detriment of a member
 
 
 [170]
 8 Criticizing the official action of a superior officer
 
 
 [19]
 Although the Supreme Court has rejected the theory that public employment may be subjected to any conditions, regardless of how unreasonable, it also observed that "(a)t the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)
 
 
 [20]
 It is true that Rule 170.8 prohibits criticism of the official action of a superior officer and is thus similar to a regulation we struck down in Gasparinetti v. Kerr, supra, as overbroad. The regulation there at issue provided that a Police Department member shall not "publicly disparage or comment unfavorably or disrespectfully" on the official acts of superior officers or on the orders of the Department. In Gasparinetti, however, the activity for which the police officer was disciplined was speech. Thus, the "substantial overbreadth" rule of Broadrick was inapplicable. However, even if Broadrick had been applicable, the overbreadth of the Gasparinetti rule was both real and substantial for the rule was specifically directed at regulating speech. Here, however, Rule 170.8 is only one of a range of possible applications of Rules 169.16 and 169.23. Those rules are substantially directed at a spectrum of activities in which the City has a legitimate interest in regulating. Thus, if the rules are overbroad, we cannot say that the overbreadth is substantial
 
 
 [21]
 Herzbrun v. Milwaukee County, supra, provides further support for our conclusion. There, the Seventh Circuit considered a regulation similar in substance to those rules challenged here and concluded that it was not substantially overbroad. The regulation challenged in Herzbrun prohibited "acts or omissions unbecoming an incumbent of the particular office or position held." Although conceding that the regulation at issue might have some limited application to protected speech, the court rejected the overbreadth challenge. Central to the court's conclusion was its observation that the rule was directed at "employee behavior including a wide spectrum of harmful, constitutionally unprotected conduct, not intended to convey any message and manifestly subject to state regulation." 504 F.2d at 1196. Thus, the court found that whatever overbreadth might exist would be more appropriately cured through a case-by-case analysis of the particular fact situations to which the rule was applied. Id
 
 
 [22]
 Aiello also asserts that Rules 169.16 and 169.23 constitute an invasion of privacy. The district court concluded that this constituted "nothing more than a reformation of his vagueness and overbreadth objections." 426 F.Supp. at 1293 n.47. Thus, the court declined to treat this contention separately. We agree
 
 
 [23]
 See, Note, Overbreadth Review and the Burger Court, 49 N.Y.U.L.Rev. 532, 532 n.3 (1974):
 Although entertaining overbreadth challenges in enforcement proceedings from defendants whose own conduct is not constitutionally protected is a departure from the usual discretionary rule against the assertion of vicarious or hypothetical claims, it presents no article III standing problem since the interest of the defendant in not being punished under the overbroad law is sufficiently adverse to constitute a case or controversy. . . . A standing problem may exist when the attack is in a suit for declaratory or injunctive relief. (Citations omitted, emphasis added.)
 
 
 [24]
 Contrary to the dissent's assertion, we do not believe that the use of vulgar language is without at least some first amendment protection. See Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 2114 (1974). Nor do we disagree that the personal tastes of federal judges are irrelevant in the adjudication of first amendment rights. Nevertheless, as part of Aiello's claim of an unconstitutional chilling effect, he did contend that he was deterred from using "kitchen talk," i. e., vulgar language. That characterization is not ours but his. We do not single out his use of such language or express any opinion concerning its permissibility but merely recite the various elements of his claim
 
 
 [25]
 The dissent suggests that had Aiello "been more effectively prepared" for his testimony at the deposition, he "might have been able to describe in more appealing terms" the constraints he felt and that under such circumstances a jury might have sustained Aiello's claims. The trial judge, however, in disposing of the motion for summary judgment, was bound by the record before him and we may not speculate on the possibility of what a jury might have done on another record
 
 
 [26]
 The dissent appears to argue that Aiello's pleading allegation of a chilling effect is, by itself, sufficient to withstand a motion for summary judgment. Although once the prevailing rule in this circuit, that was repudiated by the 1963 amendment to Fed.R.Civ.P. 56. See Sound Ship Building Corp. v. Bethlehem Steel Co., 533 F.2d 96, 99, (3rd Cir. 1976). As Fed.R.Civ.P. 56(e) states that "a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him." Here, not only does Aiello's deposition testimony fail to support his allegations of a chilling effect, but directly contradicts his allegations in that regard
 
 
 [27]
 In United States v. Leighton, 386 F.2d 822 (2d Cir. 1967), the Second Circuit declined to apply Venuto's per se rule where the district court had prohibited the defendant and his counsel from conferring during an eighty-five minute luncheon recess. Although the court observed that the trial judge's ruling was "quite plainly uncalled for," it declined to reverse the conviction because it could perceive "no actual harm to the right to effective assistance of counsel." Id. at 823
 
 
 [28]
 See, e. g., Stocker Hinge Mfg. Co. v. Darnel Indus., Inc., 377 N.E.2d 1125 (Ill.App.1978); Curtin v. Continental Homes, 360 A.2d 96 (Ver.1976) See also Thompson v. Atlantic Bldg. Corp., 107 A.2d 784 (D.C.Mun.App.1954)
 In Potashnick v. Port City Constr. Co., 609 F.2d 1101 (5th Cir. 1980), the Fifth Circuit, under a set of facts inapposite to this case, has recently considered the issue and concluded that the Geders rule should apply to civil actions. In Potashnick, counsel for the defendant violated the district court's ruling and spoke with his client during a break in his testimony. Had the court's ruling been observed, it would have precluded the defendant from consulting with his attorney for a period of seven days, including several overnight recesses. As a result of violating the court's ruling the defendant was forced to proceed without a jury. In light of our disposition of this issue, however, we need not consider the wisdom of the Potashnick decision.
 
 
 [1]
 See, e. g., DeLong Corp. v. Raymond International, Inc., No. 79-1509, 622 F.2d 1135 (3d Cir. April 14, 1980); Small v. Seldows Stationery, No. 79-1719, 617 F.2d 992 (3d Cir. March 21, 1980); Sanford v. O'Neill, 615 F.2d 92 (3d Cir. 1980); Gavin v. People's Natural Gas Co., 613 F.2d 482 (3d Cir. 1980); Rhodes v. Robinson, 612 F.2d 766 (3d Cir. 1979); Perks v. Firestone Tire & Rubber Co., 611 F.2d 1363 (3d Cir. 1979); Anthony v. Ryder Truck Lines, Inc., 611 F.2d 944 (3d Cir. 1979); Remak v. Quinn, 611 F.2d 36 (3d Cir. 1979); Suskind v. North American Life & Casualty Co., 607 F.2d 76 (3d Cir. 1979)