**Christopher GIBSON, Plaintiff,**

v.

**MAYOR AND COUNCIL OF THE CITY OF WILMINGTON, a municipal corporation, et al., Defendants.**

**No. 00–780 GMS.**

United States District Court, D. Delaware.

Dec. 11, 2001.

Thomas S. Neuberger, Martin Haverly, Wilmington, DE (James J. Nicely, Knicely & Assoc., Williamsburg, VA, of counsel), for Plaintiff.

Jan A. T. van Amerongen, Jr., Reed Smith, Wilmington, DE, John R. Sheridan, City Solicitor, Brenda James Robert, Cathy A. Jenkins, Assistant City Solicitors, for Defendants.

## MEMORANDUM AND ORDER

SLEET, District Judge.

## I. INTRODUCTION

On August 24, 2000, the plaintiff, Christopher Gibson ("Gibson"), filed this wrongful discharge lawsuit against the Mayor and Council of the City of Wilmington pursuant to 42 U.S.C. § 1983. In his complaint, Gibson alleges that the Wilmington Police Department (the "Police Department") terminated him pursuant to an overbroad and vague municipal policy, which infringed on his First Amendment right to free speech. Gibson further argues that the police trial board's *ex parte* proceedings resulted in a biased board. Finally, he argues a member of the police trial board was biased against him during his termination proceedings. As a result, he claims that his right to procedural due process was violated.

Presently before the court is Gibson's motion for partial summary judgment.[1] The court will deny the motion because there are genuine issues of material fact to be resolved by a fact finder.

## II. STANDARD OF REVIEW

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

1. Gibson's motion for partial summary judgment includes a claim from his complaint based on impermissible retaliation under the Free Speech Clause. Specifically, Gibson claims that the Police Department filed the Directive 7.3D charges in retaliation for his earlier disapproval of a Police Department funding plan. However, Gibson has failed to brief this claim in the Argument sections of either the Opening Brief or the Second Reply Brief in support of his motion for partial summary judgment. Thus, insofar as the retaliation claim relates to Gibson's funding speech, the court will not address it in this order.

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Boyle v. County of Allegheny, Pennsylvania,* 139 F.3d 386, 392 (3d Cir.1998). Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle,* 139 F.3d at 392. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields,* 178 F.3d 170, 173–174 (3d Cir. 1999).

With these standards in mind, the court will describe the facts that led to the motion presently before the court.

### III. BACKGROUND

On July 15, 1999, Gibson was scheduled to serve a one-day suspension from his job for failure to follow the sick leave policy. In connection with that suspension, the Police Department required him to surrender his departmental equipment on July 15, 1999. Gibson failed to do so. On July 16, 1999, Gibson was scheduled to return to work at 6:00 A.M. Instead of reporting to work, however, Gibson placed a telephone call to Sergeant Stevenson ("Stevenson") at 5:36 A.M., calling off sick.

Directive 6.42(A)(9) of the Wilmington Police Officers' Manual (the "Manual") requires than an officer calling off sick follow the following procedure:

[The officer] shall not leave his location, unless authorized by the Police Physician or the officer's private physician. If the authorization is granted, and prior to leaving *their reported location,* it will be the responsibility of the officer to inform the House Sergeant of his leaving *that reported location.* The officer will also report the reason for leaving that location. (emphasis added)

During the July 16, 1999 telephone call, Gibson informed Stevenson that his location was 1208 Pearl Street, Wilmington. In fact, Gibson was calling from 401 Llangollen Boulevard in New Castle.

On that date, Sergeant Greg Ciotti ("Ciotti"), Gibson's immediate commanding officer, learned that Gibson had failed to turn in his equipment on July 15, 1999, as he was required to do. Thus, at 12:30 P.M. on the 16th, Ciotti went to the 1208 Pearl Street address to collect the equipment. Although Ciotti could see someone in the house, no one answered the door. He next called the Police Department radio room to determine whether he was at the correct location. The radio room dispatcher confirmed that 1208 Pearl Street was Gibson's purported location. The dispatcher then telephoned Gibson at the call-off number he had provided to Stevenson that morning. Gibson answered this telephone call. He was not, however, at his call-off location. In response to the dispatcher's telephone call, Gibson responded by saying, "Ah right now, I don't have any clothes on right now. I'll give'em a call."

Following Gibson's actions on July 16, 1999, Ciotti believed that Gibson had lied to him. Accordingly, he began an investigation of Gibson regarding possible dishonesty and residency rule violations. In connection with this investigation, he scheduled Gibson for an interview with the Office of Professional Standards ("OPS").

On August 30, 1999, Sergeant Carolyn Hartsky ("Hartsky") interviewed Gibson, who was represented by counsel. During that interview Gibson admitted he had not been forthright on July 16th. Specifically, when Hartsky asked why he instructed the dispatcher to give the less than forthright statement to his sergeant, Gibson replied:

> I know that ah I was supposed to be at 1208 Pearl Street, that's where I called off sick.... Well, like I said I know that I was supposed to be at 1208 Pearl Street, and if I wasn't there, then I knew that I would be facing disciplinary action....

In further response to questions about whether be was being truthful with the dispatcher, Gibson admitted that he violated Directive 7.3 D. This Directive is entitled "Dishonesty," and requires an officer to be both truthful and forthright.[2] Gibson acknowledged that his answer to the dispatcher was "probably not forthright."

Gibson further compounded the issue by collaborating with his brother, a civilian Police Department radio room employee, to support his initial deception about his location. He admitted these continuing efforts at deceit when Hartsky produced a transcript of his July 16th telephone conversation with his brother. During that conversation, Gibson asked his brother, "[d]id anybody ask you anything?" His brother replied, "[l]et me call you back on an...." Gibson acknowledged that his brother was referring to an untaped line. He further acknowledged that he and his brother "c[a]me up with an idea of what should be said [to Ciotti] in case [the matter] came back up later." He finally admitted that the statement they agreed to adopt was that Gibson had been in his room all along.

Hartsky subsequently concluded her investigation by charging Gibson with two counts of dishonesty and failure to follow the sick leave policy. A hearing on these charges before a Complaint Hearing Board (the "Board") was set for December 13, 1999. After a random selection process, the three Captains selected to sit on the Board were Captains Rita Crowley ("Crowley"), Michael Maggitti ("Maggitti") and Marlyn Dietz ("Dietz").

Prior to the scheduled hearing, Hartsky hand-delivered a trial "packet" to Gibson's attorney and to each member of the Board. The packet contained an exact copy of each item that OPS presented at the hearing. Among the items contained in the notebook were: (1) a descriptive statement of each of the three charges against Gibson; (2) Hartsky's investigative report; (3) a departmental information report prepared by Ciotti; (4) transcripts of OPS' August 24, 1999 and September 8, 1999 interviews with Gibson's brother; (5) a transcript of OPS' August 30, 1999 interview with Gibson; (6) transcripts of the July 16, 1999 phone calls; (7) the Illness Leave Report filled out by Stevenson recording Gibson's 5:36 A.M. sick leave call; and (8) Gibson's thirteen page memorandum outlining his factual and legal contentions.

The December 13, 1999 hearing lasted a full day. Each side called and cross-examined witnesses. Each side had the opportunity to submit evidence. Gibson's attorney objected to the admission into evidence of Hartsky's report. He did not, however, have any objection to its submission as a written "opening statement" or "pre-trial brief." The Board advised Gibson's attorney that it would not treat the

---

**2.** Directive 7.3D reads as follows: "Members and employees are required to be truthful and forthright at all times. Violations of this reg- ulation will result in disciplinary action as specified for a Class "A" violation, with the only penalty being dismissal."

report as evidence. Gibson's attorney did not object to the admission into evidence of any of the other documents contained in the packet.

Gibson's attorney made three further motions before the Board. First, he made a motion to disqualify Dietz for bias. The Board found that Dietz was impartial, unbiased, and fit to serve. It therefore denied this motion. Second, Gibson's attorney made a motion requesting access to the OPS files of other officers accused of dishonesty. This motion also requested access to records relating to contracts concerning residency investigations of Gibson. The Board determined that these records were irrelevant to the proceedings. Finally, Gibson's attorney made a motion to admit psychological/psychiatric abstracts and reports, in the absence of the persons who created them. The Board also denied this motion. The Board did, however, give Gibson leave to provide testimony regarding the state of his mental and emotional health.

At the conclusion of the December 13, 1999 hearing, after hearing hours of testimony, asking questions of witnesses themselves, examining witness demeanor, assessing witness credibility and listening to the arguments of Gibson and his counsel, the Board found Gibson guilty of each of the three charges. On January 1, 2000, the Board submitted a full memorandum of its decision.

On December 17, 1999, Gibson filed a seven-page amended appeal to the Appeal Board. The Appeal Board consisted of the Chief of Police, a representative from the City's Personnel Department, and the Vice–President of the Fraternal Order of Police (the "FOP"). The Appeal Board convened on February 29, 2000. Addressing each of Gibson's issues on appeal, it unanimously upheld the decision of the Board.

## IV. DISCUSSION

### A. Facial Overbreadth Challenge

■ Gibson first argues that Directive 7.3D is unconstitutionally overbroad on its face because it restricts a substantial amount of constitutionally protected speech.

■ A court may invalidate a statute on its face if it is substantially overbroad. *See New York v. Ferber*, 458 U.S. 747, 769, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). However, courts will not find overbreadth where it believes "... that the intrusions upon protected conduct sanctioned by the statute were marginal compared with its primary thrust aimed at clearly regulable conduct." *Aiello v. City of Wilmington*, 623 F.2d 845, 854 (3d Cir.1980) (citations omitted). There are four factors relevant to a substantial overbreadth analysis. *See id.* First, the court must balance the permissible versus the impermissible applications of the regulation. *See id.* Second, the court should consider the historic or likely frequency of the regulation's "conceivably impermissible applications." *Id.* With regard to the second factor, the Third Circuit noted, "... if that frequency is relatively low, it may be more appropriate to guard against the statute's conceivably impermissible applications through case-by-case adjudication rather than through facial invalidation." *Id.* Third, the court should consider the nature of the activity or conduct sought to be regulated. *See id.* Finally, the court must assess the nature of the state interest undergirding the regulation. *See id.*

#### 1. Permissible Versus Impermissible Applications of Directive 7.3D

■ The first factor a court must consider is the permissible versus the impermissible applications of the regulation.

*See id.* When weighing this factor, the court must be mindful that "some sensitivity to reality is needed; an invalid application that is farfetched does not deserve as much weight as one that is probable." *Id.* Moreover, the state has a significant governmental interest in "regulating some speech of police officers in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution." *Gasparinetti v. Kerr,* 568 F.2d 311, 315 (3d Cir.1977).

Gibson alleges that many otherwise permissible types of speech could be punished or stifled by Directive 7.3D. He cites political speech, private communications between husband and wife, and expressions not related to the performance of an officer's regular duties as examples. He further argues that the application of Directive 7.3D lies within the discretion of the Chief of Police and the Police Department. As such, he contends that there are no identifiable standards which govern the decision of when to charge an employee with a violation of Directive 7.3D.

Directive 7.3D was enacted in response to the Attorney General's request to ensure that Wilmington Police Officers are credible witnesses in criminal trials. Its goal is to eliminate police officers who are less than forthright and truthful in order to ensure the police department's ability to fight crime. As such, its primary thrust is aimed at arguably regulable conduct. *See Gasparinetti,* 568 F.2d at 321 (holding that states must be given considerable leeway to regulate the police). Furthermore, Wilmington Public Safety Director David Bostrom ("Bostrom") stated at his deposition

that "... the Office of Professional Standards looks at conduct in the context in which it occurs ... [speech] that is purely private, that has nothing to do with the discharge of official duties, is not something that would fall under the purview of the Office of Professional Standards." Accordingly, the Police Department itself acknowledges that Directive 7.3D includes only lies under oath or situations where an officer is not forthright with regard to the discharge of official duties.[3]

While the court is cognizant that there could conceivably be a situation where the application of Directive 7.3D would violate the First Amendment, it would be a remote incident. The list of impermissible applications Gibson suggests are untenable given the Police Department's acknowledged application of this Directive. Thus, given the state's substantial interest in regulating these public employees, the court finds that this factor weighs against granting Gibson's motion for summary judgment.

2. The Frequency of Directive 7.3D's Impermissible Applications

If the frequency of impermissible applications is relatively low, case-by-case adjudication is warranted. *See Aiello,* 623 F.2d at 854. The court finds that this is such a situation.

Gibson argues that the Directive's conceivable impermissible applications are vast. Specifically, he claims that any time an employee is not forthright, whether on or off the job, he or she is subject to termination. However, in response, city officials Bostrom and Chief of Police Michael Boykin ("Boykin") stated that the

---

**3.** Gibson argues that his alleged violation did not occur during the discharge of his official duties because he was off-duty at the time it occurred. The court disagrees. Gibson is alleged to have affirmatively failed to follow the Police Department's sick leave policy. Complying with the Police Department's directives is clearly part of a police officer's official duties.

Directive is applicable only to sworn testimony and non-private speech that is related to the discharge of official duties. It is not applicable to private communications between family members. Accordingly, the frequency of impermissible applications is low. Thus, this factor also weighs against the granting of summary judgment.

### 3. The Nature of the Conduct Sought to be Regulated

"The substantiality of a statute's overbreadth may be determined by the nature of the activity or conduct sought to be regulated." *Aiello*, 623 F.2d at 855. "The area of unregulable speech available to public employees ... is narrower than that available to the public at large." *Id.*

Gibson contends that Directive 7.3D seeks to regulate pure speech "at all times." He further alleges that there are no limiting constrictions to the Directive. The court finds Gibson's argument untenable. As stated above, Police Department officials have narrowed the parameters of the Directive. Under their official interpretation, it applies only to testimony given under oath and statements made in the scope of one's employment. It neither applies to purely private speech that is not related to the discharge of official duties, nor truthful speech.

### 4. Nature of the City's Interest in Directive 7.3D

As the Third Circuit recognized in *Aiello* with regard to the City of Wilmington Fire Department, concerns of efficiency, discipline, and public trust are highly relevant in cases involving regulation of public officials. *See Aiello*, 623 F.2d at 855.

On the present facts, the court finds that the City of Wilmington has a significant governmental interest in regulating this speech since a police officer is a public servant. *See Gasparinetti*, 568 F.2d at 321. Furthermore, the Directive specifically responds to the Attorney General's concern that police officers maintain their credibility as witnesses. Should police officers be allowed to be less than truthful and forthright, the police department would be unable to fulfill its duties of instilling confidence in the community and providing credible witnesses at trial.

Accordingly, balancing the above *Aiello* factors, the court finds that Directive 7.3D is not substantially overbroad. There are few, if any, impermissible applications of it as narrowed by the Police Department's own statements under oath. Moreover, the City of Wilmington has a great interest in maintaining the integrity of its police officers. Thus, the court will deny Gibson's motion for summary judgment on this ground.

### B. Vagueness

Gibson further challenges Directive 7.3D on the ground that it is vague and, therefore, facially invalid. For the following reasons, the court finds that Gibson lacks standing to challenge Directive 7.3D with respect to vagueness because the Directive clearly applies to his admittedly unforthright conduct.[4]

A statute or regulation must fail for vagueness if it forbids or requires the doing of an act in terms so vague that men and women of common intelligence must necessarily guess at its meaning. *See Broadrick v. Oklahoma*, 413 U.S. 601,

---

4. The court passes no judgment on whether Gibson affirmatively lied on July 16, 1999. As Gibson points out in his Reply Brief, whether or not he lied is a "hotly contested issue." As such, it is clearly not appropriate for the court to decide this issue on summary judgment.

607, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). However, if the challenged regulation clearly applies to the challenger's conduct, he or she cannot challenge the regulation for facial vagueness. *See Parker v. Levy,* 417 U.S. 733, 755–56, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *San Filippo v. Bongiovanni,* 961 F.2d 1125, 1135, n. 14 (3d Cir.1992). If the challenger is fully aware that the improper conduct for which he or she is charged, and which he or she admitted to be true, violates the regulation or statute, the regulation or statute cannot be vague as applied. *See Suddarth v. D.M. Slane,* 539 F.Supp. 612, 619–620 (W.D.Va. 1982). Thus, if the challenger's conduct is plainly within the terms of the regulation, it will not be struck down, "even though marginal cases could be put where doubts might arise." *Arnett v. Kennedy,* 416 U.S. 134, 159, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

Gibson alleges that Directive 7.3D is vague. Therefore, he argues that it could not have put him on notice that his actions on July 16, 1999 would be considered violative of Directive 7.3D. The court finds, however, that Gibson's contentions on this point are negated by his own prior testimony and affirmative statements. Gibson himself admitted he was "probably not [being] forthright" in his discussion with the police dispatcher. He also admits that his actions violated the Police Department's regulations. Specifically, Gibson stated "I know that I was supposed to be at 1208 Pearl Street, and if I wasn't there, then I knew that I would be facing disciplinary action." Accordingly, the court finds that Gibson reasonably understood that his conduct was proscribed by Directive 7.3D. Summary judgment in favor of Gibson on this issue is thus inappropriate. *See Parker* 417 U.S. at 755–56, 94 S.Ct. 2547.

### C. Due Process

Gibson alleges two due process violations in his complaint. First, he argues that the Board members were not impartial because they received OPS Packets in advance of the hearing. Second, he contends that there was actual bias on the part of Dietz, and finally, that Dietz' sitting on the Complaint Hearing Board created an appearance of impropriety. The court will address each of these allegations in turn.

### 1. The OPS Packets

■■■ Due process is a "flexible and context sensitive concept." *Izquierdo v. Sills,* 68 F.Supp.2d 392, 415 (D.Del.1999). In fulfilling due process requirements, an impartial decisionmaker is required before final deprivation of a property right. *See Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982). An impartial decisionmaker is not required, however, at the pre-termination stage where the employee has the option of post deprivation *de novo* evaluation. This is so because *de novo* review provides the "means by which [the employee] can receive redress for [his] deprivations." *McDaniels v. Flick,* 59 F.3d 446, 454 (3d Cir.1995) (citing *Schaper v. City of Huntsville,* 813 F.2d 709, 714–716 (5th Cir.1987)). Moreover, mere exposure to adjudicative facts alone is insufficient to support a finding of bias at a later adversary proceeding. *See Withrow v. Larkin,* 421 U.S. 35, 55, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

■■■ Gibson does not claim that the Board members were exposed to information they were not entitled to see. In fact, he objected prior to the hearing only to the admission into evidence of one item in the packet. At that time, the Board agreed not to consider that one disputed item as evidence. Gibson's current complaint is thus limited to the allegedly premature provision of the documents to the

Board members. On this count, Gibson has failed to provide any undisputed evidence sufficient to sustain a summary judgment verdict that the Board members prejudged any portion of the case before them. Rather, Gibson merely claims, without more, that the Board members "had weeks to review the government's evidence," "had the opportunity to discuss the prosecution's evidence informally," and "could decide his fate at their leisure."

It is clear that the packets in question were received in advance of the proceedings and reviewed by the Board members and Gibson himself. The record, however, does not conclusively support a finding that the Board members prejudged anything. Accordingly, there exists a material issue of fact which a trier of fact must decide. Summary judgment is denied.

2. Dietz' Alleged Actual Bias

On October 5, 1999, Gibson filed a motion requesting Dietz' recusal from the Board. The first ground for this motion was Gibson's assertion that Dietz may himself have been under investigation by the Board.[5] As such, Gibson argued that Dietz might have been subject to pressure from the Board to rule a certain way in exchange for leniency in his own case. He therefore would not have been impartial. Gibson also alleged that Dietz might have had "independent knowledge of the facts and would not be an independent hearing officer" because he was in Gibson's chain of command. By letter dated November 15, 1999, the Inspector of Internal Operations informed Gibson that his request had been reviewed and denied. Specifically, the letter stated that Dietz was not currently under investigation himself. Therefore, there was no implied or apparent

ability of the Board to pressure Dietz. Further, Dietz was not in Gibson's chain of command, nor was he in any other way involved with the disputed matter, aside from sitting on the Board.

■ Gibson subsequently brought this suit and motion for summary judgment questioning Dietz' impartiality. He argues that there is "uncontested circumstantial evidence of bias" and that "[a] review of the tape of the hearing confirms the hostility and bias of defendant Dietz in the conduct of the hearing." The court, however, finds that there are disputed issues of material fact.

■ An "atmosphere of tension and unmannerliness" and "demeaning exchange[s] among counsel and between the trial examiner and counsel" does not warrant a finding of bias. *See NLRB v. Dennison Mfg. Co.,* 419 F.2d 1080, 1085 (1st Cir.1969) Furthermore, the Supreme Court has recognized that a judge is not even required to recuse himself based on his ruling against a party in a prior proceeding and his statements that arguably suggested animosity toward a party. *See Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

On the present facts, Gibson brings forth allegations that Dietz was biased. In support of this position, he points to the testimony of Lieutenant Ruth Townsend, that Dietz was guilty of the offense for which OPS investigated him. He also points to the videotape of the Hearing as evidence of Deitz' bias. However, neither of these sources offer undisputed evidence of bias. Indeed, the defendant in rebuttal has offered into evidence Hartsky's affidavit that Dietz' demeanor during the hearing was no different from his usual style

---

**5.** OPS had previously conducted an investigation of Dietz as a result of a complaint raised by one of his subordinates, arising from his performance review of the subordinate. OPS determined that the complaint was unfounded.

and conduct. Thus, because some expressions of impatience, annoyance, and anger are within the bounds of a factfinder's constitutional conduct, reasonable minds could differ on the degree of the Board's conduct as evidenced by the videotape. *See id.* Further, the court cannot pass on the credibility of the proffered evidence. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that credibility determinations, the weighing of evidence, and the drawing of inferences are jury functions). Accordingly, because a reasonable jury could find that Dietz was not biased or partial, the court will deny summary judgment based on actual bias.

### 3. The Appearance of Impropriety

Gibson alternatively alleges that, at the very least, an impermissible appearance of impropriety existed during his hearing. The court also declines to grant summary judgment on this issue. Gibson relies on the same evidence in arguing this point as in his actual bias argument. However, like in the actual bias argument, the meaning of the alleged inappropriate actions of the Board are subject to varying interpretations and degrees. When viewing the evidence in the light most favorable to the defendant, for example, one could reasonably find that Dietz owed no favors to the Board because the case against him had already been dismissed. It would also be reasonable to conclude that Dietz' accuser was not credible, thereby providing a legitimate reason for closing the case against Dietz. There would thus be nothing to create an appearance of impropriety. Accordingly, summary judgment in favor of Gibson on the appearance of impropriety is denied.

### V. CONCLUSION

For these reasons, IT IS HEREBY ORDERED that:

1. The Motion for Partial Summary Judgment (D.I.50) filed by Christopher Gibson is DENIED.